Patricia ALFORD, Plaintiff,

v.

DCH FOUNDATION GROUP LONG–TERM LIFE INSURANCE COMPANY OF AMERICA; and UNUM Life Insurance Company of America, Defendants.

No. CV 00–05238 ABC CWX.

United States District Court,
C.D. California.

June 1, 2001.

Lawrence D. Rohlfing, Santa Fe Springs, CA, for plaintiff.

Edwin A. Oster, Gregory P. Vidler, Barger & Wolen, Irvine, CA, for defendant.

ORDER RE: PLAINTIFF'S MOTION TO EXPAND ADMINISTRATIVE RECORD; PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ERISA)

COLLINS, District Judge.

This case involves Plaintiff's claimed entitlement to benefits under a long-term

disability benefits plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Three separate Motions came on regularly for a hearing before this Court on June 1, 2001:(1) Plaintiff's Motion to Augment and Expand the Record Under Review ("Motion to Expand"); (2) Plaintiff's Motion for Summary Judgment ("Plaintiff's MSJ"); and (3) Defendant's Motion for Summary Judgment ("Defendant's MSJ"). After consideration of the papers, the case file, and the parties' oral arguments, and for the reasons indicated below, the Court hereby DENIES the Motion to Expand, GRANTS Defendant's MSJ, and DENIES Plaintiff's MSJ. Therefore, the Court also DISMISSES Plaintiff's entire Complaint, with prejudice.

## I. PROCEDURAL HISTORY

Plaintiff PATRICIA ALFORD ("Alford," or "Plaintiff") commenced this civil action by filing an initial Complaint on May 15, 2000.[1] The Complaint names DCH FOUNDATION GROUP LONG–TERM DISABILITY PLAN and UNUM LIFE INSURANCE COMPANY OF AMERICA ("UNUM," or "Defendant") as the nominal Defendants. Only UNUM has ever appeared and defended in the action, however, and is by all accounts the sole operative Defendant.

On January 31, 2001, the parties submitted, and the Court signed, a Stipulation and Order setting out a briefing and hearing schedule for expected motions to expand the record, and for summary judgment, and also selecting pre-trial and trial dates in this matter.[2] Under the schedule set by the Stipulation and Order, on April 2, 2001 the parties filed the three instant Motions. The Motions were originally noticed for a hearing on April 30, 2001. Also on April 2, 2001, the Administrative Record ("AR") in this case was lodged by Defendant.[3] On April 16, 2001, the parties filed their oppositions to each of the three Motions (the "Expand Opposition," the "PMSJ Opposition," and the "DMSJ Opposition"). On April 23, 2001, they filed their replies (the "Expand Reply," the "PMSJ Reply," and the "DMSJ Reply"). Along with the moving and opposing papers, the parties also filed the requisite statements of uncontroverted facts, statements of genuine issues, etc.

On April 20, 2001, the Court ordered additional briefing by the parties on the possible application of the "notice-prejudice" rule crafted by California courts to the facts of this case. *See, e.g., UNUM Life Ins. Co. of America v. Ward,* 526 U.S. 358, 366–77, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999); *Cisneros v. UNUM Life Ins. Co. of America,* 134 F.3d 939, 944–47 (1998) (finding that California notice-prejudice rule, which holds that an insurer is required to prove actual prejudice as a result of a delayed notice of claim or submission of proof in order to deny benefits, is not preempted by ERISA and therefore applies with full force). The Court gave Defendant until April 30, 2001 to file a supplemental brief of no more than ten pages, and Plaintiff until May 7, 2001 to file a sur-reply of the same length. In view of the time required for this additional briefing, the Court also continued the

---

1. This case was originally assigned to the Honorable Robert J. Kelleher. It was reassigned to this Court on May 22, 2000.

2. The respective pre-trial and trial dates of June 4 and June 12, 2001 also set by this Stipulation and Order have since been vacated.

3. There are two different numbers on each page of the AR lodged by Defendant, and it is not always clear to which of these the parties refer in their respective papers. For purposes of clarity, the Court will use a format of "AR # " to indicate a page therein (e.g., AR 452). These citations will correspond to the pages numbered as UALF–000###.

hearing on the three already-pending Motions from April 30, 2001 to May 14, 2001.

In its May 9, 2001 Minute Order, the Court determined that the "notice-prejudice" rule does not apply to this case, given that the question here is not delay in *initial* notice of an ERISA claim. As stated in that Minute Order, this case will therefore be decided under standard principles applicable to review of Plan decision-making under ERISA. Accordingly, the Court decided to go forward on these three Motions. However, some time having been lost both the parties and the Court in briefing and considering the possible application of the "notice-prejudice" rule, the Court concluded it was necessary to order a short continuance in the hearing on the three instant Motions. The Court therefore moved the hearing by two days, to May 16, 2001. This proved to be an insufficient extension of time. Therefore, on May 14, 2001, the Court again continued the hearing, to May 31, 2001. The hearing was later moved by Stipulation and Order to June 1, 2001.

## II. FACTUAL BACKGROUND

Most of the facts are undisputed in this case, and indeed most or all are contained in the AR lodged by Defendant. The Court therefore cites primarily to the AR as its evidentiary record. Where the facts, are in dispute, that is so indicated. Because the Court considers Defendant's MSJ, the Court construes these facts in Plaintiff's favor.

### A. *Plaintiff's Employment and The Long–Term Disability Plan*

For instance, it is undisputed that, prior to suffering from the alleged disability which led to this action, Plaintiff was employed by Downey Community Hospital ("DCH," or "DCH Foundation Hospital"), as a registered nurse. *See* AR 679; Statement of Uncontroverted Facts in support of Plaintiff's MSJ ("PMSJ UF") ¶ 1; Defendant's Response to Plaintiff's Statement of Uncontroverted Facts ("PMSJ UF Resp.") ¶ 1. According to her initial claim forms, Plaintiff Alford was hired by DCH in 1989. *See* AR 679. She worked there up until the time of her disability claim in 1995, apparently primarily in the operating room. *See, e.g.,* AR 362, AR 558. On May 1, 1993, a long-term disability insurance policy (No. 502337), purchased by DCH through UNUM, became effective and applicable to Plaintiff. *See* AR 257, 691, 679.

Terms of the DCH Foundation Hospital Group Long–Term Disability Plan (the "Plan") are set forth in the policy of insurance issued by UNUM. *See* AR 257–280.[4] The policy documents grant UNUM discretionary authority, in making any benefits determination, both to determine eligibility and to construe the terms of the policy. *See* AR 262.

For covered employees in Class 2 under the policy terms (a Class which apparently included Alford), the following definition applies:

"Disability" and "disabled" mean that because of injury or sickness:

1. the insured cannot perform each of the material duties of [her] regular occupation; and

2. after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which [she] is reasonably fitted, taking into consideration training, education or experience, as well as prior earnings; or

---

**4.** It appears that the Plan documents are also repeated at AR 691–722. However, both par- ties refer to this "first copy" of the policy.

3. the insured, while unable to perform all of the material duties of [her] regular occupation on a full-time basis, is:

a. performing at least one of the material duties of [her] regular occupation or another occupation on a part-time or full-time basis; and

b. earning currently at least 20% less per month than [her] indexed pre-disability earnings due to that same injury or sickness.

AR 268. Furthermore, the policy also requires proof of disability, as well as timely proof that the disability is ongoing and being treated:

When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period [180 days]. The benefit will be paid for the period of disability if the insured gives to the Company proof of continued:

1. disability; and

2. regular attendance of a physician. The proof must be given upon request and at the insured's expense.

AR 274. Plaintiff filed a claim form under the terms of this policy on August 18, 1995. *See* AR 679–682; PMSJ UF ¶ 2; PMSJ UF Resp. ¶ 2. The employer statement filed therewith listed her last day of work as being April 21, 1995. It also noted that Plaintiff changed to a part-time position in April, 1995 in lieu of lay-off. *See* AR 679–680.

### B. Plaintiff's Medical Condition(s)

Though details of Plaintiff's claimed disability are not fully described in any of the parties' submissions, from descriptions in subsequent medical reports, and Plaintiff's own notes on the claim forms and elsewhere, a basic picture of her injuries and illnesses emerges. It appears that sometime in 1993, perhaps in early July, Plaintiff suffered a stroke. *See* AR 362; AR 681. She then began to have periods of lethargy, confusion, and disorientation. *See id.* It seems that these may have been a result of the stroke. *See id.*

Plaintiff experienced severe headaches and episodes of numbness over the next two years or so. *See id.* Abnormalities identified as "[b]rain lesions" showed up on an MRI taken of Plaintiff. *See* AR 362; AR 683. At some point prior to May, 1995, Plaintiff also began having partial complex seizures and occasional grand mal seizures. *See* AR 362; AR 628; AR 683–684. Complicating treatment of her seizures was the fact that Plaintiff was also a Type I diabetic on an insulin pump. *See* AR 362. According to her treating physician in 1995, Dr. Andrew Charles (Neurologist), Plaintiff's diabetes made seizure control with medication a difficult proposition. *See* AR 684. Inevitable episodes of hypoglycemia experienced due to her diabetes also contributed to her periods of confusion and disorientation. *See* AR 362. In 1995, Plaintiff was under the care of Dr. David Berger (Endocrinologist) for her diabetes. *See* AR 362. His notes indicated that at that time her diabetes symptoms were relatively under control. *See* AR 647. Further complicating matters, however, Plaintiff also suffered from asthma and hypothyroidism. She was also a smoker (in 1995). *See* AR 362. As an apparent result of her diabetes, at that time Plaintiff also suffered from peripheral neuropathy (numbness in her extremities). *See* AR 363.

Finally, Plaintiff was apparently also suffering from back and neck problems and pain, dating back to at least 1991, when she was reportedly involved in an automobile accident. *See* AR 363. She had difficulties with both her neck and lower back, and had a documented cervical

disc herniation without neural compromise. *See id.* She also had a bilateral carpal tunnel release in October, 1994, although she seemed to have a complete recovery after the procedure. *See id.*[5]

According to the report of UNUM's on-site physician, based on his review of Plaintiff's medical files conducted in 1997, Plaintiff began having performance issues in her work as an operating room nurse at least by August, 1994, in the form of making errors, having difficulty staying awake, and/or exhibiting a very short attention span. *See* AR 362. This observation is confirmed by internal correspondence between Plaintiff's supervisors. *See* AR 399. It appears these problems came to a head in March or April of 1995. Effective April 3, 1995, she was apparently transferred from her post as an operating room nurse to an ostensibly less demanding (part-time) job in Home Health (traveling to patients' homes to administer care). *See* AR 398. It appears she was offered this post as an alternative to being laid off. *See* AR 680. However, she reportedly continued to have some difficulty following instructions, was observed to have a very short attention span, and was described as having a tendency to literally get up and wander off. In addition to these and other problems, her peripheral neuropathy was said to interfere with her ability to take a pulse. *See* AR 398.

### C. Plaintiff's Initial Claim(s) for Benefits

Based on these ongoing difficulties, Plaintiff's tenure in the Home Health department was relatively brief, lasting only about two weeks. Apparently, her last

day of work was April 21, 1995. This is the date Plaintiff listed on her disability claim form(s). *See* AR 679; *see also* AR 398 (memorandum detailing a supervisor's concerns). Plaintiff filed her UNUM claim on August 18, 1995. *See* AR 681–682. She was forty-five years old on the date she filed for UNUM disability benefits (DOB: October 22, 1949). *See id.* On August 29, 1995, to supplement her claim, Plaintiff's treating neurologist, Dr. Charles, completed a Physician's Statement to accompany Plaintiff's claim that listed her primary "Symptoms" as consisting of "Episodic alteration in consciousness consistent with complex partial seizures." AR 683.

Dr. Charles also listed as a "secondary condition" Plaintiff's "Brittle diabetes mellitus with frequent hypoglycemic episodes." *Id.* Dr. Charles listed the date of onset for an inability to work as being June 1, 1995.[6] He stated that he had first seen Plaintiff in June of 1994, had last seen her on August 25, 1995, and that she had regular visits with him every three months. *See id.* Dr. Charles listed the medications Plaintiff was taking as Tegretol and Insulin. *See id.* In support of his conclusion that Plaintiff was disabled, he stated that Plaintiff could not perform any function where loss of consciousness would be a risk to herself or others, nor could she perform any heavy lifting. He stated that the seizures continued despite medication, and that her diabetes made seizure control difficult. *See* AR 684.

On September 1, 1995, UNUM acknowledged receipt of Plaintiff's claim for benefits. *See* AR 286. On September 8, 1995,

---

**5.** The Court does not suggest that this is a complete index of the symptoms or underlying conditions from which Plaintiff may have been suffering in 1995. However, this description does indicate what seem to have been her primary complaints at the time she filed her claim.

**6.** This June 1, 1995 date was apparently for some period the date that UNUM used as the initial date of disability. It was then revised to April 21, 1995, to reflect Plaintiff's last day of work at DCH.

UNUM sent a letter to Plaintiff, stating that it needed more detailed information about her restrictions and limitations, and a detailed description of the requirements of her occupation, in order to determine whether she met the definition of "disability" and "disabled" as given in the DCH Foundation Hospital policy (which was laid out in the letter). *See* AR 668. UNUM stated that it had requested documentation from DCH as to the physical requirements of Plaintiff's occupation, and that it was also contacting Dr. Berger and Dr. Charles to get medical information "necessary to continue the evaluation of your claim." *Id.* The letter stated that the evaluation would be completed once this information was received, and Plaintiff was invited to help by encouraging her physicians to promptly supply the necessary responses. *See id.*

By letter dated October 6, 1995, UNUM again indicated that the information thus far received was insufficient for it to agree to pay benefits. *See* AR 628. Though the letter acknowledged that records received from Dr. Berger indicated a seizure prior to May 26, 1995, UNUM noted that his treatment notes also reflected that Plaintiff had reportedly been doing well since, and that she was looking for work. "[T]here presently is no medical information in file to substantiate any restrictions and/or limitations other than your own subjective complaints.... we ask that you provide us with medical evidence to support your inability to perform each of the material duties of your occupation .... if we do not receive medical certification within 30 days of the date of this letter, we will have no alternative but to assume you are no longer claiming disability benefits

... [and] to deny further liability on your claim." AR 629 ("October 6 Letter").

On May 18, 1995, prior to having applied for disability benefits under the UNUM policy, Plaintiff had also applied for Social Security disability benefits. Her initial efforts on this claim were no more successful, as her claim for benefits based on inability to work as a result of "Diabetes" and "Brain Lesions" was denied, *inter alia,* on August 2, 1995, and again on November 9, 1995. *See* AR 631; AR 530.[7]

### D. The First Denial of Plaintiff's Claim

During the thirty-day period given by the October 6 Letter for Plaintiff to respond to UNUM with additional information, phone calls by Plaintiff and her brother to UNUM representative Robert Castellon, Disability Benefit Specialist, resulted in extensions in the thirty-day response period, first to November 13, 1995, and then to November 22, 1995. *See* AR 625–627. Plaintiff saw Dr. Charles (neurologist) on November 1, 1995. On November 16, 1995, Dr. Charles submitted to UNUM a letter, dated November 1, 1995, in which Dr. Charles repeated many of the findings in the initial Physician's Statement submitted along with the original claim forms, including: that Plaintiff was subject to complex partial seizures, and had recently had at least one focal motor seizure; that the cause of her seizures was not clear, but was most likely related to undiagnosed brain lesions (on MRI); and that her diabetes might contribute to the seizures, and made it difficult to control them with medication. *See* AR 623 ("November 1 Letter").[8]

---

7. These denials were later overturned by Administrative Law Judge ("ALJ") Lana H. Parke. On December 3, 1996, ALJ Parke determined that Plaintiff was entitled to benefits as of April 21, 1995. *See* AR 552.

8. The November 1 Letter also stated that Plaintiff "is disabled for one year, although this may be extended ..." AR 623.

Following receipt of the November 1 Letter from Dr. Charles, the staff at UNUM conducted a review of her case, requested additional information and clarification from Dr. Charles, and also had Plaintiff fill out an Education and Employment History form, listing among other things the duties of her job at DCH (as a registered nurse working primarily in operating rooms). *See* AR 614–622. They also referred her file, including the assessment(s) of disability by Dr. Charles, to an occupational/vocational consultant, Alan Ey, CRC. *See* AR 612–613.

On January 18, 1996, UNUM representative Castellon sent another letter to Plaintiff, which referenced all the information received to that point by UNUM, including the notes previously received from Dr. Berger (which Castellon described as indicating that Plaintiff was doing better and was looking for work), the November 1 Letter from Dr. Charles, and the evaluation by the vocational consultant. *See* AR 609–610. The letter noted that Dr. Charles had stated in his November 1 Letter that Plaintiff was prevented "from performing any task which would be compromised by sudden losses of consciousness or awareness," but stated that their vocational consultant believed that based on her restrictions and limitations and her background, "that [she] would be able to engage in [her] occupation as a Registered Nurse." AR 610.[9] The letter said no benefits were payable, and that UNUM was closing the file. Plaintiff was told to submit new information to Castellon, and/or make a written request for review within sixty days. *See id.*

### E. Plaintiff's First Appeal

On March 7, 1996, Plaintiff's brother (William Alford) wrote a letter to UNUM, contesting the decision to deny benefits. *See* AR 608. He said that "there may be more medical evidence for review," and also noted that Plaintiff was continuing with her application for Social Security disability benefits. *See id.* The letter also requested that UNUM provide any documents "you feel support the denial of benefits and a complete copy of the vocational consultant's evaluation ..." AR 608. In the interim, Plaintiff was seen by Dr. Jacob Rabinovich (Orthopaedic Surgeon). Dr. Rabinovich prepared a letter-report dated March 14, 1996. *See* AR 592–602. On May 1, 1996, Plaintiff forwarded a copy of Dr. Rabinovich's report to UNUM. *See* AR 591; AR 576–590.

The March 14, 1996 report by Dr. Rabinovich was focused on the Plaintiff's complaints of continued pain to her neck and back (and of radiating pain down her left leg). *See* AR 592. Dr. Rabinovich did include a review of the medical records provided to him, which spanned from January 23, 1991 to June 21, 1994 (as well as a "normal" stress echocardiogram performed November 8, 1995), though they were clearly not all of the records for that period. The focus of this review was Plaintiff's neck and spine problems, though Dr. Rabinovich did also comment on her other problems (e.g., her treatments for diabetes, her neurological complaints, etc.). The report concluded that Plaintiff, based on the pain, and lack of mobility, in her neck and spine, was "unable to return to work in her prior job duties ..." AR 600. Dr. Rabinovich opined that this was not

---

**9.** Earlier in the letter, Castellon stated that the policy insured Plaintiff "for the occupation of a Registered Nurse ... which can require physical demands ranging from sedentary to heavy, depending on where the oc-

cupation is being performed and the specific tasks ..." AR 609. "[A] nurse must be unable to perform the material duties that cover the full range of occupational demands [to be disabled]." *Id.*

likely a pre-DCH disability, but was likely 50% a result of Plaintiff's "arduous job duties" at DCH, and 50% a result of two prior automobile accidents. *See* AR 600–601.

At this point in the case, Plaintiff's claim was apparently taken over on behalf of UNUM by Nancy Doyle, a Senior Benefit Analyst.[10] In her notes on a form headed with "ERISA REVIEW," Doyle went through all of the various stages of the case, including the initial application, the "loss of consciousness" restrictions and limitations identified by Dr. Charles, the parallel Social Security application (and denial), the November 1 Letter from Dr. Charles, the vocational consultant (Ey) evaluation, the January 18, 1996 denial, and the appeal therefrom by Plaintiff's brother. Doyle's notes also referred to the orthopaedic evaluation by Dr. Rabinovich, but noted that it was "re *neck & back problems* not related to her dis[ability] claim." AR 575 (emphasis in original). Doyle referred the file to an on-site medical consultant for UNUM, Dr. Richard Herman, for a records review, and for comment on Plaintiff's reasonable restrictions and limitations. *See* AR 571.

Dr. Herman reviewed Plaintiff's records on September 25, 1996, with the understanding that she was claiming disability from partial complex seizures and diabetes. However, he concluded that the records from Dr. Berger, the "short note" (the November 1 Letter) from Dr. Charles (which was apparently not accompanied by any medical records), and the report prepared by Dr. Rabinovich were "not complete enough for me to render an opinion regarding any impairment." AR 570. He said he would need: additional records from Dr. Charles, including any test results; neurological records from a Dr. Randolph Shey; and also any neurosurgical records from Dr. Harley Deere (two of

Plaintiff's prior physicians) *See id.* Due to this finding (or lack thereof), as well as on other grounds, UNUM once again denied Plaintiff's claim.

Nancy Doyle communicated this denial by letter and by phone on September 27, 1996. *See* AR 569 (Doyle notes on phone call); AR 564–566 ("September 27 Letter"). In the September 27 Letter, Doyle once again laid out the definition of "disability" and "disabled" given by the policy, and revisited the history of Plaintiff's claim. Noting the limitation in Dr. Charles' August 29, 1995 Physician's Statement and November 1 Letter that Plaintiff could not work in any position where her potential loss of consciousness might pose a risk, Doyle pointed out that as per the vocational consultant's recommendation it seemed Plaintiff's experience "would be suitable for ... transfer to nursing positions within the registered nurse occupation which would not involve potential danger to patients" from loss of consciousness. AR 565. Doyle referenced the vocational consultant's observation that Plaintiff might be able to work in "sedentary to light duty positions such as Physician's Office Nurse, Home Health Nurse Supervisor, and Insurance Rehabilitation Nurse." *Id.* Doyle explained this analysis:

Our policies are designed to protect the insured worker from the inability to perform his or her occupation, not the individual requirements of the job or the specific requirements of the work place. Although you may not be able to return to your specific job with your previous employer, this does not preclude you from performing your occupation with a different employer in a different position which can be performed with your restrictions and limitations. Our determination of liability is not based on the availability of jobs, but on whether or

---

**10.** The Court assumes this was the first stage · of ERISA "review."

not you are capable of returning to work in your own occupation.

*Id.* Doyle implied this was the basis for the January 18, 1996 denial.

Doyle also indicated that UNUM's on-site physician had concluded there was insufficient medical documentation to support impairments precluding Plaintiff's work capacity. As for Dr. Rabinovich's report, Doyle noted that it did not refer to any abnormal testing performed *after* June, 1994, and did not otherwise support disability. *See id.*

Doyle stated that there were no medical records supporting the claim for disability in the months prior to and following the date of disability in 1995, nor any documentation of a progressive worsening of Plaintiff's seizure condition prior to her last day of work April 21, 1995.[11] *See id.* Doyle described the work restrictions placed by Dr. Rabinovich (no heavy lifting, or any repeated pushing, pulling, or repeated flexion of the spine) as "prophylactic," and indicated that these would not preclude the "sedentary and light duty" positions that had been identified by the vocational consultant. *See id.* Based on these findings, Doyle concluded that Plaintiff's "file documentation, including the medical and vocational evidence, [did] not support that [Plaintiff was] precluded from performing the material duties of the above-referenced nursing positions within your regular occupation as a registered nurse at the time ... you stopped working as of 4/21/95. Therefore, it is our determination that your claim was appropriately denied on 1/18/96, and your claim remains closed." *Id.* Along with this letter, Doyle provided a copy of the (Ey) vocational evaluation.

This decision was subsequently upheld by the UNUM Quality Review department, and affirmed on October 28, 1996. *See* AR 561 (October 28, 1996 memorandum from Carlene Anderson, in Quality Review, to Al Hemond in Western Regional Benefits); *see also* AR 560, AR 562–563. This was apparently intended to be UNUM's final action on Plaintiff's claim.

### F. Plaintiff's Request for Further Review

On December 3, 1996, Plaintiff's prior denial of Social Security disability benefits was overturned by ALJ Parke. The decision said that Plaintiff was entitled to benefits beginning on April 21, 1995. *See* AR 552. The ALJ relied on medical records from 1987 to 1995, as well as a smaller number of records from 1996. The latest records in the list of referenced exhibits were those of Dr. Berger, ostensibly including records up to October 30, 1996 (Exhibit 28). *See* AR 554.

At this point, Plaintiff engaged an attorney to take over seeking benefits under the UNUM policy. On February 27, 1997, Plaintiff's counsel Lawrence Rohlfing sent a letter to UNUM contesting the "final" decision rendered on September 27, 1996. *See* AR 558–559.[12] Rohlfing first referenced the ALJ decision to grant Social Security benefits, and promised to provide a copy of that decision. Rohlfing then went on to attack the substantive bases for UNUM's decision to deny her benefits.

11. The letter from Doyle also identified some confusion about the actual last day of work for Plaintiff (e.g., her employer reported it as April 21, 1995, Dr. Charles' Physician's Statement referred to June 1, 1995, Dr. Berger's notes indicated the next Friday after March 28, 1995 would be her last day but also indicated that she was unemployed by April 28, 1995, and on her own claim form Plaintiff listed July 3, 1993 as her "last day of work"). "[S]ignificant questions are raised regarding the basis for your last day of work ..." AR 566. It does seem, however, that Doyle decided to go ahead with the April 21 date.

12. Rohlfing has remained Plaintiff's counsel up to the present.

He argued that the (Ey) vocational opinion did not state that Plaintiff would be able to work in what he identified as her "regular occupation as an operating room nurse." AR 558. Rohlfing concluded that Plaintiff was entitled to benefits per the "regular occupation" definition of disability for the first twenty-four months, because she could not work as an operating room nurse. *See id.*

He further concluded that Plaintiff would be entitled to benefits thereafter because even the occupations identified by the vocational consultant paid less than 80% of Plaintiff's pre-disability earnings, so that Plaintiff would be able to qualify for the post-twenty-four month definition of disabled under the third prong thereof. *See id.*

> The 3 numbered paragraphs defining disability sets ¶ 1 as always required. In addition to an inability to perform the regular occupation, the person must have that inability *and* either the inability to engage in any gainful occupation *or* the inability to earn at least 80% of the pre-disability earnings. Your decision completely fails to discuss disability under the 80% provision of the policy. If your decision is that Patricia Alford could work at the jobs identified at the earnings level stated, and if she worked at 1 of those jobs, you would still owe LTD benefits.... Furthermore, Patricia Alford's 24th month of disability entitlement will not pass until October of this year. [¶] These are the issues that would get litigated in the event of the filing and service of a complaint in the United States District Court....

AR 559. Subsequently, on March 13, 1997, Rohlfing again wrote to UNUM (addressing the letter, as with the first, to Nancy Doyle), attaching, *inter alia,* the December 3, 1996 ALJ decision. *See* AR 546–556.

On March 18, 1997, Doyle responded to Rohlfing by letter, with a brief acknowledgment of the recent correspondence. Though the letter was a bit ambiguous, it appeared to agree to a further review. *See* AR 557. A subsequent letter from Doyle to Rohlfing, dated April 9, 1997, referenced the February 27 and March 13, 1997 letters from Rohlfing, but stated "[a]fter further review we find that our previous decision to deny further benefits was correct and we are upholding [it]." AR 545. No reasoning was given. However, Doyle did point out that the ALJ decision forwarded by Rohlfing listed medical records not then contained in the claim file (Exhibits 14–16, 18, 19, 21, 22, 24, 26 and 27),[13] and said that if Plaintiff submitted the records "within 30 days," UNUM's on-site physician would do a further review. *See id.*

### G. Review of Additional Medical Records

On May 1, 1997, Rohlfing did apparently submit a "complete copy" of the ALJ "exhibit file on Ms. Alford's Social Security case," though the list of Exhibits fronting the voluminous submission attached to Rohlfing's cover letter does not appear to match the Exhibit List to which Doyle referred in inquiring about the medical records. *See* AR 371 (cover letter); AR 372–373 (Exhibit List); AR 374–542 (records). The Exhibits omitted were those numbered 24–28 on the previous list.[14]

**13.** Exhibit 14: Dr. Deere 03/21/91–04/14/94; Exhibit 15: Dr. Shey 05/17/94–05/31/94; Exhibit 16: Dr. Michael Perley 04/19/94–09/27/94; Exhibit 18: DCH 07/26/94–04/21/95; Exhibit 19: UCLA Medical Center 04/27/95–01/04/96; Exhibit 21: Cherry Medical Grp.—Psych. Eval. dated 10/20/95; Exhibit 22: Dr. Charles Physical Capacities Eval.

04/04/96; Exhibit 24: Doctors Hospital of Lakewood 02/20/87–07/13/92; Exhibit 26: Dr. Alyssa Watanabe 02/27/96; Exhibit 27: DCH 01/23/91–12/08/95.

**14.** In addition to those already listed above, the records omitted were among the more recent ones available. Exhibit 25: Dr. Rabi-

The records submitted included the procedural history of Plaintiff's Social Security claim for benefits and various reports prepared for that purpose (Exhibits 1–10), questionnaires completed by Plaintiff for purposes of securing Social Security benefits (Exhibits 11–13), medical records from 1991 to 1995 (Exhibits 14–20), and a Consultative Psychiatric Evaluation Report prepared by Dr. Khang Nguyen on October 20, 1995 (Exhibit 21). Exhibit 22, a Physical Capacities Evaluation Form dated April 4, 1996, apparently completed by Dr. Charles, does not seem to be included in the AR, and the Court can only presume it was also omitted from the documents submitted by attorney Rohlfing.

On July 21, 1997, Doyle responded by letter, acknowledging the receipt of "additional medical information in support of Ms. Alford's re-appeal ..." AR 544. Doyle said UNUM had requested review by an on-site physician, a review which was expected to be completed within three to four weeks. *See id.* The record does indicate that the very same day, July 21, 1997, a "high priority" Medical Review Request was sent by/from Nancy Doyle, once again to Dr. Herman. *See* AR 370.

Dr. Herman was pointed to his prior review on September 25, 1996, which, Doyle's Request reminded him, "did not find sufficient medical documentation to support" disability. *Id.* In referring to the ALJ decision on the Social Security benefits, Doyle's Request stated that she found it "puzzling" because "the majority of records" on which it apparently relied "are related to ... carpal tunnel syndrome and prior [auto accidents]." *Id.* She also called the October 20, 1995 Psychiatric Evalua-

tion by Dr. Nguyen "unremarkable." *Id.* Doyle asked Dr. Herman to review his prior report, and the information submitted on May 1, 1997. Doyle noted that, "[v]ocationally, we do not argue that [Plaintiff] cannot return to work as a home health nurse, but as [a Registered Nurse] could do other [Registered Nurse] positions which would not involve direct patient care. Does the additional medical information change our prior medical assessment?" *Id.*

On July 25, 1997, Dr. Herman performed the requested "re-review" of Plaintiff's file. *See* AR 362–364. Dr. Herman's review first gave a medical history of Plaintiff's various conditions, including: her apparent stroke in 1993; her following periods of lethargy, confusion, and disorientation; her MRI abnormalities; her severe headaches and episodes of numbness; her 1995 onset of seizures; her Type I diabetes; her asthma; her hypothyroidism; her peripheral neuropathy; her back and neck problems (stemming from a 1991 auto accident); and her 1994 bilateral carpal tunnel release. *See* AR 362–363. Dr. Herman noted that Plaintiff began having performance problems at work in 1994, and her transfer to Home Health did not solve the problems. *See* AR 362. He observed that Dr. Charles, Plaintiff's neurologist, had put her on disability soon after (1995), and that Dr. Charles had stated that she should not work where loss of consciousness was a danger. *See id.*

Dr. Herman noted that Dr. Charles had concluded that Plaintiff's seizures were difficult to control, in part because of her diabetes. Also, "Dr. Charles's records describe recurrent intermittent episodes of confusion in spite of treatment with Tegretol." AR 362. In April, 1995,[15] Dr.

---

novich 02/08/96; Exhibit 28: Dr. Berger 03/28/95–10/30/96.

**15.** Dr. Herman's report actually referenced a "4/97" date for this restriction, but this was clearly a typographical error. There were no

records from Dr. Charles from 1997 in the records which were sent to Dr. Herman for review. Furthermore, it is clear that the opinion to which Dr. Herman referred is a short letter written by Dr. Charles to Plaintiff's supervisor(s) on April 28, 1995. *See* AR

Charles had apparently "restricted her from driving due to drowsiness secondary to medications." *Id.* Referring to the October 20, 1995 Psychiatric Evaluation, Dr. Herman observed that Dr. Nguyen had also noted Plaintiff's history of seizures and memory impairment, and had discovered that Plaintiff's father suffered from Alzheimer's Disease. However, Dr. Herman also noted that Dr. Nguyen had concluded there was no psychiatric illness and that Plaintiff's intellectual function was preserved. *See* AR 363–364. "This conclusion was based primarily on claimant's ability to do proverbs and serial sevens but did not involve any detailed neuropsyche testing." AR 364. On forms filled out for purposes of securing the Social Security benefit, Dr. Herman noted that both Plaintiff and her brother had described periods of blackouts and confusion "where claimant can not follow even simple instructions and has problems with concentration." AR 364.

### H. Request(s) for Additional Information

Though acknowledging these claims and diagnoses, Dr. Herman came to the ultimate conclusion that he could not yet render an opinion:

> Evaluation of this claimant is made difficult by the lack of medical documentation as to the severity of her impairment. If she is indeed having frequent periods of confusion, an inability to concentrate and memory loss then she would have no work capacity. If these are infrequent episodic problems related only to seizures and, in between, her intellectual functioning is intact then she may have some work capacity. The

evaluation for Social Security by Dr. Nguyen seems rather superficial and does not really give us much information except that claimant does have times in which she intellectually functions well. However, two supervisors describe [a] confusion severe enough to make them worry about claimant's safety which suggests a rather significant impairment. I will attempt to call or write to Dr. Charles to get additional information about any neuropsyche testing that may have been done or any potential treatment. I would also need to know the frequency and extent of the impairment. If claimant had work capacity from a cognitive perspective then [some] accommodations might have to be made for her neck and low back. . . . I have written a letter to Dr. Charles but will still try to reach him by telephone. Another option might be to call the endocrinologist if we do not get a response from Dr. Charles.

AR 364 (signed and dated July 25, 1997). Dr. Herman did, it appears, send a letter to Dr. Charles, dated July 26, 1997, asking for "help in answering a few questions." AR 367. The letter asked, for instance, whether Plaintiff had ever undergone any neuropsychological testing, or whether any was planned in the future. It also asked whether Dr. Charles felt that Plaintiff's periods of confusion were frequent and severe enough to prevent any work capacity, or whether she might be able to work in a less demanding nursing position. Finally, it asked about Plaintiff's mental function *between* seizures (i.e., it stayed normal vs. she suffered a residual deficit),

390. In that letter, sent to Pat Pritchard at DCH, Dr. Charles stated, *inter alia:*

> Although her seizures are generally well controlled with medication, we are in the process of adjusting her medications to ensure that she does not have any seizure activity. *In the meantime she should not*

> *drive, and she may have some drowsiness due to increased medication.* I therefore consider her disabled with regard to her present position as a home-health staff RN for at least 3 months.

AR 390 (emphasis added). Thus, Dr. Herman must have intended "4/95."

frequency of seizures and their type (i.e., partial complex vs. grand mal), whether Plaintiff was presently able to drive, and/or her chances for improvement. Dr. Herman urged Dr. Charles to call or write in response. *See* AR 367.

On August 1, 1997, Rohlfing acknowledged and responded to Doyle's July 21, 1997 letter, and thanked her for the response. *See* AR 543. He also requested that "[w]hen you have your on site physician review the records, I request the opportunity to provide issues and comments in writing." *Id.* (citing 29 C.F.R. § 2560.503–1(g)(i)–(iii)).

On October 29, 1997, Doyle (on behalf of UNUM) again wrote to Rohlfing (Plaintiff's counsel), indicating that there was a delay in the UNUM on-site physician's review of the additional information sent in on May 1, 1997 precipitated by the on-site physician's inability to get any response from Dr. Charles to his queries for clarification or additional information. *See* AR 365. To this October 29 letter, Doyle attached a copy of the letter sent by Dr. Herman to Dr. Charles, said that the letter had been sent after Dr. Herman was unsuccessful in raising Dr. Charles by telephone, and stated that "to date we have not received a response from Dr. Charles." *Id.* Doyle asked if Rohlfing might be able to help secure a response from Dr. Charles, or if he could provide contact information for any other physician who might be able to answer questions raised by UNUM's on-site physician. She also requested that Rohlfing provide documentation of the amount of monthly Social Security benefits that Plaintiff was receiving. *See id.* In closing, she said: "We would welcome the opportunity to reach a final determination regarding Ms. Alford's re-appeal; however we do not have adequate medical information at this time." *Id.*

On December 9, 1997, Rohlfing responded to the October 29, 1997 letter from Doyle. He stated that he had personally written to Dr. Charles on October 29, 1997, and asked if Dr. Herman had yet heard anything from him. He also enclosed a copy of the award letter from Social Security, indicating the benefit level. *See* AR 350.

Finally, Rohlfing made the following assertions in this December 9, 1997 letter to Doyle, with regard to assessing Plaintiff's claim:

> I want to remind you of my request of August 1, 1997, to review and comment upon any medical documents on which you base any decision. Please recall that on February 25, 1997, we took [sic] position that Patricia Alford's usual and customary work consisted of an operating room nurse. It seems fairly clear from information we have that Patricia Alford has [sic] entitlement to benefits through October 1997. With respect to ongoing benefits, I want to either statementize or depose Mr. Ey. I want to take that action before you make any final decision with respect to benefits [sic] October 1997. In order for me to properly ask Mr. Ey questions, I need to know exactly what residual functional capacity you believe Patricia Alford retains . . .

AR 350. Rohlfing concluded by saying that he looked forward to the resolution of Plaintiff's claim, and to "getting Patricia Alford back into pay status with UNUM." AR 351 (with enclosures).

## I. *Negotiations and Settlement Discussions*

Following this letter, Doyle and Rohlfing began engaging in more intensive discussions about Plaintiff's claim, a possible settlement thereof, and Plaintiff's disability status and appropriate benefits under

the policy. In a phone call on December 17, 1997, it appears Doyle asked if Alford might be interested in settling the claim for a total of twenty-four months' worth of benefits ("regular occupation" period), with Social Security offset but a minimum monthly benefit of $100.00 per month. *See* AR 348 (Doyle's notes on phone call). Doyle also noted she told Rohlfing UNUM had yet to hear from Dr. Charles or from any other physician, and Rohlfing again stated that he had sent a letter to Dr. Charles on October 29, 1997. Finally, Doyle's notes indicate that she asked Rohlfing what documentation he needed from her (as per his December 9, 1997 letter), and that Rohlfing eventually stated that he did not in fact need anything more from her. *See id.*

On January 7, 1998 and again on February 3, 1998, Rohlfing sent letters to Doyle which, *inter alia*, acknowledged their recent phone conversation(s) about settlement and the contents of the claim file. *See* AR 332 ("January 7 Letter"); AR 326 ("February 3 Letter"). The January 7 Letter also attached Exhibit 19 from the Social Security claim file, which consisted of records from Dr. Charles between June 7, 1994 and August 24, 1995.[16] In that letter, Rohlfing objected to and criticized the vocational consultant's conclusions as to nursing jobs in which Plaintiff might be able to work despite her seizures, arguing that she had neither the experience nor the training to do some of the jobs he had identified, and that her condition(s) would preclude her from doing the others. In closing, the January 7 Letter said Plaintiff was considering the settlement offer. *See* AR. 333.

The February 3 Letter followed up on an issue apparently first discussed by Rohlfing and Doyle in their December 17,

1997 telephone conversation: the number of hours per week Plaintiff was considered to have been working at the time that she went out on disability (thus, her earning potential on her "last day worked," or "LDW"). In that section of the claim form(s) initially filed by Plaintiff in August, 1995 which were completed by her employer, DCH, Plaintiff was listed as having been employed for a regular work week of sixteen hours per week. *See* AR 679. Thus, it is apparent that as of December 17, 1997, Doyle was operating on the assumption that this would be the basis for calculation of benefits to replace pre-disability wages. *See* AR 348.

In the February 3 Letter, Rohlfing argued that the basis should instead be thirty-two hours per week, based on Plaintiff's employment status immediately prior to her last day of work on April 21, 1995. He based this conclusion on employment records received from DCH, and attached copies of those records to the February 3 Letter to Doyle:

> The employee history form indicates that as of April 9, 1995, Patricia Alford changed to part-time status. This consisted of 32 hours per week at the same rate of pay, specifically $21.10 per hour. The [enclosed] personnel action form ... confirms part-time status change to 32 hours per week. The final personnel action form indicates discharge as of August 16, 1995, because of an inability to return from a medical leave of absence. Please add this documentation to the claim file.

AR 326. Rohlfing concluded by noting that "[y]ou and I did discuss some sort of settlement. Obviously, the additional earnings and schedule for 32 hours per week makes a big difference in any poten-

---

**16.** Rohlfing particularly pointed out the April 28, 1995 letter to Plaintiff's supervisor(s) at DCH, advising that Plaintiff was disabled at that point for at least three months. Rohlfing indicated that this confirmed an onset of her disability of no later than April 28, 1995.

tial settlement offer. Please advise me of your current posture." *Id.*

On February 16, 1998, Doyle apparently called and confirmed the thirty-two hour work week with the pertinent person at DCH. *See* AR 324 (Doyle's notes on phone call). This seemed to signal acceptance on behalf of UNUM that any calculation of the payable benefits would be based on a thirty-two hour work week. Her notes also indicate that she had confirmed Plaintiff's "DOD" (date of disability) to be April 21, 1995, having also apparently cleared this up with DCH. *See id.*

On February 17, 1998, Doyle and Rohlfing had another telephone conversation, in which Doyle, *inter alia,* indicated that UNUM was now willing to calculate Plaintiff's benefit based on a thirty-two hour work week. *See* AR 320–321 (Doyle's notes on phone call). Using that basis, Doyle offered a new settlement figure of $11,244.48, which was twenty-four months of benefits minus Social Security offsets for those months, calculated based on a thirty-two hour work week. *See id.*

Doyle and Rohlfing also apparently discussed the erstwhile Dr. Charles, from whom Doyle did not believe Dr. Herman, or anyone else with UNUM, had ever heard. Rohlfing was apparently surprised to hear this. Doyle explained that Dr. Herman was actually *no longer working* with UNUM, but that she had no indication that he had ever heard from Dr. Charles. Doyle explained again that Dr. Herman's July 25, 1997 report, while noting that Plaintiff's complaints were serious enough to warrant comment and concern for safety from her supervisors at DCH, also noted that the medical records were not complete. However, based on the implications of that report, Doyle indicated that she would be nonetheless willing to settle Alford's claim for the twenty-four month "regular occupation" period, for the amount described above. *See id.*

On March 20, 1998, Rohlfing again wrote to Doyle, to follow up on his two previous letters. "I am also under the impression that Dr. Charles has finally both spoken to and corresponded with Dr. Herman." AR 319. Rohlfing asked Doyle to confirm or deny whether there had in fact between communication(s) between the two physicians, and also to provide him with any result of those communications. "Please provide me with a copy of Dr. Herman's report and analysis ..." *Id.* The letter also touched on other issues, such as a prior disability leave taken by Plaintiff from September 1993 to January 1994, due to hand surgery, as well as a proposed transfer to Home Health at that time that never went through. *See id.* As for references in Dr. Berger's May, 1995 treatment notes to Plaintiff looking for work (*see* October 6 Letter), the letter emphasized that Plaintiff's entire search for work consisted of perusing a copy of "Nurse Week." *See id.* Rohlfing also acknowledged the settlement discussions, but conceded that he had lost his notes thereon, and asked to be reminded of their status. *See id.*

### J. Final Settlement Offer and Final Denial .

After sending a letter on April 3, 1998 acknowledging Rohlfing's March 20, 1998 letter, and after attempting to call on April 13, 1998, Doyle sent Rohlfing a letter dated June 26, 1998. *See* AR 313–315 (the "June 26 Letter"). Along with the June 26 Letter, Doyle attached a copy of Dr. Herman's July 25, 1997 review of Plaintiff's records. She also made clear that Dr. Herman had never heard from Dr. Charles, or from any other physician who might provide insight into Plaintiff's condition(s), despite UNUM's efforts to enlist Plaintiff's help in securing this cooperation. *See* AR 213. Doyle acknowledged that along with Rohlfing's January 7, 1998 letter, he had included records from Dr.

Charles from 1994 and 1995, including an April 28, 1995 report (letter) from Dr. Charles to DCH indicating that Plaintiff should be disabled as a home health nurse for at least three months. *See id.* However, she noted that the most recent medical record UNUM had from Dr. Charles was his letter/report dated November 1, 1995. In that letter, Doyle observed, Dr. Charles stated that Plaintiff's condition was not continually disabling, but prevented her from performing any job where loss of consciousness would endanger safety. She noted that he also stated Plaintiff would remain disabled for one year. *See id.*

Doyle also acknowledged that, as they had discussed on the phone, the personnel file documents submitted on February 3, 1998 supported a thirty-two hour work week for Plaintiff prior to her April 21, 1995 date of disability. *See id.* Therefore, Doyle indicated, UNUM had recalculated Plaintiff's payable benefit based thereon, so that it would now be a basic monthly benefit of $1,755.52 (or sixty percent of basic monthly earnings of $2,925.87 prior to disability), before the deduction for the Social Security benefits received. *See id.*

Doyle emphasized in the June 26 Letter that UNUM did not have any "ongoing treatment records supporting Ms. Alford's disability or to support that she has been under the regular attendance of a physician since Dr. Charles' 11/1/95 report." AR 314. Nonetheless, the June 26 Letter indicated that, based on Dr. Charles' November 1, 1995 opinion and the necessarily incomplete review by Dr. Herman, UNUM was prepared to accept that Plaintiff was unable to perform her regular occupation "as a home health nurse" through November 1, 1996 (one year from the date of Dr. Charles' opinion letter). *See id.* "Therefore, we are willing to pay Ms. Alford's net benefits, after the social security offset, from 7/21/95, the end of the policy 90 day

elimination period wherein no benefits are payable, through 11/1/96. Thereafter, we have no proof of [Plaintiff's] continuing disability." *Id.*

While sympathizing with the difficulty Rohlfing was experiencing in reaching Dr. Charles, Doyle stated that UNUM was simply unable to make an assessment of continuing disability without the submission of further medical information "from Dr. Charles or any other attending physician ... to certify the extent of Ms. Alford's impairments due to her medical condition from 1995 through the present." *Id.* While conceding that Plaintiff *might* remain disabled, Doyle stated that "we do not have sufficient medical documentation to assess her condition since 11/1/95." *Id.* The letter then concluded with a "final" offer:

> If you do not wish to submit additional medical information to support Ms. Alford's ongoing disability since 1995, we will agree to a settlement of 24 months of net benefits after the social security offset.... [¶] In the event that Ms. Alford is not interested in our settlement offer, we will pay her benefits through 11/1/96. She will then need to submit ongoing medical records from the end of 1995 through the present in order that we may assess her ongoing medical condition to determine [entitlement to benefits].

AR 315. Doyle promised to contact Rohlfing soon, by phone. *See id.*

The June 26 Letter was apparently transmitted by facsimile on June 29, 1998. On the cover sheet thereto, Doyle asked Rohlfing to call her to discuss its contents. She also indicated that she would soon be transferring out of the UNUM appeals section "and would like a response from you before the end of this week if possible." AR 312. According to Doyle's phone notes, Doyle and Rohlfing spoke

that day (June 29, 1998) by telephone, and went through the terms of the June 26 Letter. Doyle explained that UNUM had allowed "ample time" for the submission of additional medical information from Dr. Charles or any other attending physician, and was now offering a choice: twenty-four months of benefits, or payment through November 1, 1996 with a chance for further payment upon additional documentation. Rohlfing promised to discuss the offer(s) with Plaintiff and respond. *See* AR 311.

The next day, on June 30, 1998, Doyle's phone notes reflect that Doyle and Rohlfing again communicated by telephone. *See* AR 309. In this conversation, Rohlfing evidently told Doyle that Plaintiff did not want to settle for twenty-four months of benefits. Rohlfing said that Plaintiff would be sending additional medical records supporting continued treatment for a disabling condition. The two also discussed delivery of the check for benefits through November 1, 1996. *See id.*

On July 2, 1998, Doyle sent what would be her last letter as a representative of UNUM in this case to Rohlfing, attached to which was apparently a check for benefits payable through November 1, 1996:

> As we discussed over the telephone, our review concludes that although we were unable to complete our medical investigation due to the lack of response from Ms. Alford's physician, Dr. Charles, we will accept Dr. Charles' opinion in his 11/1/95 report that Ms. Alford would continue to be disabled from her regular occupation as a registered nurse for an-

other year due to ... loss of consciousness ...

AR 306. The check covered July 21, 1995 to November 1, 1996. *See id.*

Doyle emphasized that UNUM would need additional medical records from November, 1995 onward "to determine whether Ms. Alford would be eligible for continuing benefits ..." AR 307. Doyle also pointed out that the policy required that a claimant submit proof of continued disability and regular attendance, and that this "proof must be given upon request and at the insured's expense." *Id.* (quoting the policy).

Also on July 2, 1998, in a letter which apparently crossed in the mail with Doyle's letter, Rohlfing wrote Doyle a formal rejection of the prior twenty-four month settlement offer. "She believes that her ongoing medical treatment will justify benefits beyond November 1996 and she therefore cannot in good conscience accept an offer to settle her claim for benefits ending July 21, 1997. Patricia Alford advises me that she has continued to receive treatment from Dr. Charles and Dr. Berger through April 1998. She started receiving treatment at Kaiser Permanente in May 1998." AR 299. Rohlfing asked Doyle to send him a blank attending physician form, so that Plaintiff's then-current physician could complete it. He also submitted, with the letter, a "Long Form Medical Report" (questionnaire) completed by Dr. Berger on October 30, 1996. *See* AR 301–304.[17] Rohlfing assumed this form ought to allow UNUM "to extend benefits for a reasonable period of

---

**17.** The "Long Form Medical Report" completed by Dr. Berger is not accompanied by any supporting medical records. It indicates Plaintiff had been a patient since 1990 for insulin-dependent Diabetes Mellitus. *See* AR 301. Dr. Berger described symptoms of hyper- and hypoglycemia, hand pain, headaches, neck pain after an hour of work, and back pain after an hour of work. He indicat-

ed Plaintiff was forced to lie down for 20–30 minutes a day due to back and neck pain, and that her dosage of Tegretol could cause drowsiness. He said neck and back pain placed limits on her movement, and ability to lift or carry. He noted memory and comprehension problems, and possible unforeseen blackouts. *See id.*

time beyond October 30, 1996. Please advise me in this regard." AR 299.

### K. The Final Re–Denial of Benefits

On August 5, 1998, another UNUM Senior Benefit Analyst, Bonnie Gilfillan, responded to Rohlfing's July 2, 1998 letter, saying that UNUM had "completed another review regarding the denial of benefits on your Long Term Disability claim." AR 296 ("August 5 Letter"). Citing the policy definition of "disability" or "disabled," and the proof-of-claim requirement in the policy, Gilfillan described UNUM's finding:

A review of Ms. Alford's claim file, which now includes the Long Form Medical Report completed by David Berger, M.D. on October 30, 1996 which you kindly provided, was completed. Dr. Berger's form does not indicate when or if the claimant was examined prior to its completion. The form does note that the claimant started treating with Dr. Berger on July 17, 1990 but there is no reference to her date of last treatment. Furthermore, the form notes that Ms. Alford is being seen on a monthly basis by Dr. Berger which would indicate that there is a substantial amount of medical information which we have not yet been provided. [¶] Without these records we can not consider a subsequent period of disability beyond November 1, 1996. Should you wish to obtain and provide us with copies of such information, we would be more than happy to reconsider Ms. Alford's claim for continued disability benefits beyond this period. Specifically, we would request that you furnish us with Dr. Berger's office notes and treatment records documenting the severity of her conditions and evidencing that she is under regular care as required by the policy. Please forward any additional information to my attention at the above listed address within the next sixty days. [¶] At this time and after this further review, we find that our previous decision to terminate benefits as of November 1, 1996 was correct based on the medical information [in the file].

AR 297. This was, once again, apparently intended to be UNUM's final decision, absent submission of any additional medical information.

### L. The Contested Additional Submission

Up to this point, the communications between Plaintiff's counsel and the representatives of UNUM are a matter of the record, and the parties basically agree on all the preceding events. At this point, however, the parties substantially differ on what happened next.

Plaintiff's counsel (Rohlfing) claims that on October 23, 1998, he sent a letter to Gilfillan/UNUM, to which were allegedly attached further medical records on Plaintiff's condition. The letter and the records allegedly sent are attached as Exhibit 2 to Plaintiff's Motion to Expand, and it is these documents which Plaintiff seeks to add to the AR for the Court's review. *See* Motion to Expand at 7–9.[18] UNUM denies receiving either the letter or attached records in 1998. *See* Expand Opposition at 1. Indeed, UNUM asserts that Plaintiff's counsel did not submit additional documentation until April 20, 2000. *See id.*

---

**18.** These records and the October 23, 1998 letter, which Defendant denies ever receiving, are not on their own part of the AR, except to the extent that the records were also included in a more comprehensive submission of records by Rohlfing on April 20, 2000 (see below). They are composed of (1) 1998 notes from Dr. Berger, for visits in January, February, March, and April, 1998, (2) blood tests conducted on Alford by Dr. Berger in February, March, and April, 1998, and (3) Residual Functional Capacity Questionnaires completed by Dr. Charles (July 30, 1998), Dr. Donald Chen (August 5, 1998), and Dr. Berger (September 15, 1998). *See* Exhibit 2 to Motion to Expand (the "1998 Records").

In support of his claim that the October 23, 1998 packet was both sent and received, Rohlfing points to a notation in the AR which is dated November 30, 1998. *See* AR 249. Though the computer-generated report to which Plaintiff refers is ambiguous, it appears that on that date Bonnie Gilfillan ordered Plaintiff's file from "FBO." *See id.* There is a "DATE MAIL REC'D" field in the report into which 10/29/98 is entered. Further, there is an "X" in the space next to "RE–ERISA W/MEDICAL," suggesting the "MAIL REC'D" pertained to ERISA re-review. Rohlfing's name and address are listed, preceded by a "VERY IMPORTANT" reminder: "IF THE REQUEST IS FOR A RE–ERISA AND THE MAIL HAS BEEN SENT FROM AN ATTORNEY, PLEASE INDICATE THE ATTY ADDRESS BELOW SO THE ACK LETTER CAN BE SENT TO THE ATTORNEY INSTEAD OF THE CLAIMANT!!!" *Id.*

Rohlfing argues that this notation indicates that Gilfillan/UNUM received his October 23, 1998 letter (and attached medical records) on October 29, 1998, prompting Gilfillan to order Plaintiff's file again. *See* Motion to Expand at 9. Furthermore, Rohlfing argues that another notation in the AR indicates that "UNUM intended to conduct a quality review as of December 3, 1998." *Id.* For this supposition, Rohlfing points to another computer-generated report, dated December 3, 1998, in which Karen Pience, of Disability Benefits (UNUM), sent/re-sent[19] a request for Plaintiff's file. *See* AR 250. The report states: "this file is currently in Quality Review. Check with Bonnie Gilfillan."

*Id.* Plaintiff's counsel claims that this shows that the October 23, 1998 correspondence and records initiated a process of quality review. Defendant disputes this interpretation of these notations, claiming instead that a quality review followed the August 5, 1998 decision.

Plaintiff's counsel insists that as a result of this review, on January 14, 1999, "UNUM made an internal but undisclosed decision to uphold the prior determination." Motion to Expand at 9. In support of this conclusion, Rohlfing points to an internal UNUM memorandum dated January 14, 1999 (Geoff Crain to Laura Bickford) with an "X" in the box for "This file has been (X) Upheld," and with text stating: "We have completed our handling of the attached file, and are now returning the file to your office for further handling."[20] AR 248.

Defendant UNUM disputes that any such quality review indicates the receipt of the alleged October 23, 1998 correspondence. Rather, UNUM contends that the notation identified by Plaintiff, as well as another computer-generated report on the file generated by Geoffrey Crain on January 14, 1999 (AR 305), simply "document[ ] the return of Alford's file from Quality Review where the last decision regarding her claim for benefits was made in August 1998. No additional records were received by UNUM until April 2000." Defendant's Response to Plaintiff's Statement of Additional Material Facts ¶ 22. The report generated by Geoffrey Crain on January 14, 1999 (AR 305) shows the last date of action on Plaintiff's claim as being August 5, 1998, the date on which Gilfillan sent the "final" denial letter.

---

**19.** The report actually lists the file request as having been made by two different persons: Karen Pience, and/or Christine Blier. The file was to be sent to Chris Shepard, Administrative Assistant (B359).

**20.** It is worth noting that in the "From" field on the memorandum, the name "Chris Shepard" is typed, but is lined out and has the name "Geoff Crain" handwritten above it. Chris Shepard is the name of the person to whom the file was allegedly to be sent on December 3, 1998.

### L. Final Correspondence on the Claim

Whether or not these additional records were sent and received in October, 1998 is the only real factual dispute. For instance, the parties again agree that following this (alleged) submission of the October 23, 1998 letter, and attached 1998 medical records, the next communication between anyone acting on behalf of Plaintiff, and any UNUM representative, was not until March 17, 2000. On that date, Plaintiff's counsel (Rohlfing) wrote a letter addressed to Gilfillan on behalf of UNUM, inquiring about the status of Plaintiff's claim:

You last wrote to me on August 5, 1998. At that time, you indicated that UNUM would not pay benefits beyond November 1, 1996. That letter did not specify whether Patricia Alford had additional appeal rights ... I sent additional records to you on October 23, 1998 ... I did not receive a response. Please advise if UNUM considers the August 5, 1998, denial final and not subject to further appeal.

AR 294. In this letter, Rohlfing made no attempt to explain the lapse of almost seventeen months since his alleged October 23, 1998 letter.

On April 20, 2000, apparently not having received a response to his March 17 letter, Rohlfing again wrote to Gilfillan. See AR 1. To this letter, Rohlfing attached well over two hundred pages of medical records. See AR 2–241. Rohlfing's cover letter simply stated:

I wrote to you last month concerning the above matter. I have secured additional evidence relevant to this case. I enclose for your review and inclusion in the claim file the records from Kaiser Permanente and David Berger, MD. Please rectify the deficiency in the processing of this matter. Ms. Alford would sincerely like this matter resolved favorably to her as soon as possible.

AR 1. The letter was stamped received by UNUM on April 24, 2000.

The attached records, which comprise the first two hundred and forty one pages of the administrative record, are made up of medical records pertaining to Plaintiff's treatment in 1998, 1999, and 2000 at Kaiser Permanente (beginning in May, 1998),[21] and Dr. Berger's records on his treatment of Plaintiff from 1993 to April, 1998 (which appear to include the January, February, March, and April, 1998 chart notes also allegedly submitted by Rohlfing on October 23, 1998). Thus, for the first time, Plaintiff had submitted a relatively complete medical history, and medical records spanning from 1993 to early in 2000.[22]

An internal "Fileplan" prepared by John J. Schifano of UNUM on May 5, 2000 summarized the April 20, 2000 submission as a "late re-appeal." AR 243. Schifano noted that the August 5, 1998 letter by Bonnie Gilfillan meant "denial was upheld in Quality Review." Id.

On May 8, 2000, Schifano sent the final letter of denial in this case. See AR 293. The full text of that letter is as follows:

This will acknowledge receipt of your March 17, 2000 letter and additional information[23] concerning Ms. Alford's

---

21. The Kaiser Permanente records cover several different areas of treatment, including: visits to an orthopedist, and physical therapy, for back and neck pain, visits to an endocrinologist for her diabetes, neurology visits, and various other appointments and complaints.

22. The parties dispute whether Plaintiff previously submitted the records for 1998. However, Plaintiff has never argued, nor presented any evidence, that any records covering the period between October 30, 1996 and January, 1998 were ever submitted prior to April 20, 2000.

23. Based on the text of the internal report generated by Schifano it appears the "additional information" to which he referred con-

Long–Term Disability claim. [¶] On August 5, 1998, Bonnie Gilfillan informed you to forward any additional information concerning Ms. Alford's claim within 60–days from the date of her letter. In your March 17, 2000 letter, you claim you submitted additional records to us on October 23, 1998. These records were received in our office on April 24, 2000, more than 18–months after Ms. Gilfillan's correspondence. Furthermore, I question why you did not follow-up with our office concerning the submission of the additional records in October 1998. Finally, even if you had submitted the records on October 23, 1998, this was more than 60–days after August 5, 1998, well beyond the additional two-months Ms. Gilfillan allowed. [¶] Please be advised, since so much time has passed, we can not review Ms. Alford's claim. Ms. Gilfillan's previous decision upholding the denial of benefits remains our company's position on this matter. [¶] We regret that this decision was not more favorable to you.

AR 293. Thus, UNUM never considered the additional medical records submitted by Rohlfing in April, 2000 (nor those allegedly submitted in October, 1998). Accordingly, while the records submitted in 2000 are *part* of the AR, in the sense that they are included in that official compilation of Plaintiff's UNUM file lodged with the Court, they were never a basis for any decision rendered by UNUM, and are not properly part of the record against which the Court measures UNUM's decisions.

Following receipt of this "final" letter of denial, on May 15, 2000, Plaintiff Alford filed the instant Complaint, initiating this litigation. Rohlfing remains Plaintiff's counsel. Plaintiff seeks relief under the auspices of ERISA, and reinstatement of benefits, pursuant to 29 U.S.C. §§ 1132(a)(1)(B) and 1133 (suit for benefits).

## III. DISCUSSION

The parties agree that this action arises under ERISA, and that it must be governed by standards and principles applicable thereto. They disagree as to the standard of review that ought to be applied, the record subject to review, and the proper outcome of that review. Plaintiff appeals from a decision by UNUM to deny/discontinue benefits under the long-term disability insurance policy held by her employer. Plaintiff seeks benefits retroactive to November 1, 1996, the date on which her benefits were determined no longer payable by UNUM.[24] She asks this Court to reverse UNUM's termination of her benefit payments.

As is recognized by each of the parties' papers, the first issue that the Court must address is the appropriate standard of review to apply in gauging whether UNUM's termination (or underpayment) merits reversal. In other words, before addressing the substantive grounds and forms of relief in the parties' Motions, the Court must determine the standard under which it will review UNUM's decision-making. Thus, in what follows, the Court addresses first the appropriate standard of review (Part IV.A). After making that determination, the Court then decides, pursuant to Plain-

---

sisted of the records submitted with the April 20, 2000 letter. *See* AR 243. It is clear that the May 8, 2000 letter is what Schifano referred in this internal "Fileplan" as a "late re-appeal uphold." *Id.*

**24.** Plaintiff also seeks to recover allegedly "underpaid benefits" for the July 21, 1995 to November 1, 1996 period during which benefits were deemed payable by UNUM. Specifically, Plaintiff seeks allegedly underpaid benefits from July 21, 1995–November 1, 1996 of $3,642.46, benefits from November 1, 1996 to May 1, 2001 totaling $48,999.60, and ongoing benefits from that point on. *See, e.g.,* Plaintiff's MSJ at 3.

tiff's Motion to Expand, to what record to apply that standard (Part IV.B). Finally, after settling the standard and the record, the Court determines, pursuant to the parties' summary judgment Motions, whether UNUM's decision(s) must be reversed, under this standard of review and on the delimited record (Part IV.C).

The Court has jurisdiction over this ERISA case pursuant to 29 U.S.C. § 1132(e). Plaintiff alleges that she was wrongfully denied long-term disability benefits, and seeks reinstatement thereof.

### A. Abuse of Discretion is the Appropriate Standard of Review

■■■■ A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B)[25] is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1321 (1995). Where this discretionary authority is given to the administrator by the terms of the plan, the exercise of that discretion is reviewed for abuse of discretion. *See Tremain v. Bell Industries, Inc.,* 196 F.3d 970, 976 (9th Cir.1999).

The parties do not dispute that the Plan at issue in this case confers discretionary authority on the administrator (UNUM). This is explicitly provided in the policy language thereof, which states: "In making any benefits determination under this policy, the Company shall have the discretionary authority both to determine an employee's eligibility for benefits and to con-

strue the terms of this policy." AR 262. Pursuant to the test announced in *Firestone,* therefore, this policy language confers discretionary authority, and the Court's sole inquiry, as an initial matter, is whether UNUM abused that discretion.

Plaintiff argues, however, that the Court should apply a "less deferential" standard of review because of the inherent conflict of interest created by UNUM's dual role as both administrator and payor under the Plan. Plaintiff argues that the materiality of the conflict of interest in this case warrants *de novo* review, instead. *See, e.g.,* Plaintiff's MSJ at 6. Defendant disagrees. *See* PMSJ Opposition at 3.

■■■■ Where a plan administrator is also the insurer, the "inherent" conflict of interest created by this dual role "must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone,* 489 U.S. at 115, 109 S.Ct. 948 (citation omitted); *see also Tremain,* 196 F.3d at 976; *Lang v. Long–Term Disability Plan of Sponsor Applied Remote Technology, Inc.,* 125 F.3d 794, 797 (9th Cir. 1997); *Snow v. Standard Ins. Co.,* 87 F.3d 327, 330 (9th Cir.1996). "Our review in such a circumstance, although still for abuse of discretion, is 'less deferential.'" *Tremain,* 196 F.3d at 976 (citations omitted).

■■■■ The mere *existence* of the "inherent conflict" created by a dual role as both administrator and insurer is not alone reason for this Court to depart from a review of UNUM's decision-making for abuse of discretion. *See Lang,* 125 F.3d at 797 ("the presence of conflict does not automatically remove the deference we ordi-

---

**25.** Plaintiff's Complaint is styled as an action for a declaratory judgment under 29 U.S.C. § 1132(a)(1)(B) that Plaintiff is entitled to benefits for November 1, 1996 and beyond. Plaintiff identifies the decision(s) subject to this Court's review as being the August 5,

1998 "final" denial of Plaintiff's claim for benefits, and/or the preceding July 2, 1998 denial of same. Plaintiff also seeks recovery of alleged "underpayment" of benefits, as well as an award of attorneys' fees.

narily accord to ERISA administrators who are authorized by the plan to interpret a plan's provisions."). Indeed, even the "less deferential" review applicable to inherently conflicted plan administrators or fiduciaries "does not alter our traditional abuse of discretion review *in the absence of specific facts* indicating that [the administrator's] conflicting interest caused a *serious breach* of the plan administrator's fiduciary duty ..." *Atwood,* 45 F.3d at 1322 (emphasis added); *see also, e.g., Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 943–44 (9th Cir.1999).

As the Ninth Circuit stated in *Atwood,* and has since affirmed on several occasions, the "less deferential" standard applicable to a conflicted administrator/fiduciary consists of a two-step analysis:

> First, we must determine whether the affected beneficiary has provided material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary. If not, we apply our traditional abuse of discretion review. On the other hand, if the beneficiary has made the required showing, ... [we] act very skeptically in deferring to the discretion of ... [a materially conflicted administrator].

*Atwood,* 45 F.3d at 1323; *see also, e.g., Tremain,* 196 F.3d at 976; *Friedrich v. Intel Corp.,* 181 F.3d 1105, 1109 (9th Cir. 1999). In other words, "the beneficiary needs to shoulder the [initial] burden of providing 'material, probative evidence ...'" that the conflict led to a breach of fiduciary obligations. *Friedrich,* 181 F.3d at 1109. This is the "first step" of the "conflicted administrator" analysis.

Once the affected beneficiary has *made* a sufficient showing, the "second step" of the analysis shifts the burden to the administrator:

> If the beneficiary comes forward with such evidence, "the plan bears the burden of producing evidence to show that the conflict of interest did not affect the decision to deny benefits." If the plan does not meet its burden, courts review the decision to deny benefits *de novo.*

*Friedrich,* 181 F.3d at 1109 (citing *Atwood,* 45 F.3d at 1323); *see also Newman v. Standard Ins. Co.,* 997 F.Supp. 1276, 1279 (C.D.Cal.1998). "Only if the administrator does meet its burden is it entitled to the deferential abuse of discretion standard of review." *Newman,* 997 F.Supp. at 1279. Conversely, a court only *departs* from this deferential standard where: (1) the affected beneficiary has produced material, probative evidence establishing self-interested decision-making; *and* (2) the administrator fails to rebut this showing by producing its own evidence that its apparent self-interest had no effect on a decision.

Plaintiff has failed to satisfy the first step of this analysis, in that she has produced no "material, probative evidence" that any self-interest, or conflict of interest,[26] on UNUM's part affected its decision-making or otherwise led to a breach of fiduciary obligations. There is no allegation or evidence that UNUM has offered inconsistent bases for denial, changed its interpretation of plan documents, failed to follow internal procedures for making

---

**26.** Though it is not entirely clear what evidence of self-interest or breach of a fiduciary obligation would be considered "probative," the cases thus far finding this first step of the test satisfied have focused primarily on evidence that the administrator inconsistently interpreted the terms of the policy, or offered varying reasons for a denial of benefits which seemed driven by a specific *intent* to deny. *See, e.g., Lang,* 125 F.3d at 798; *Tremain,* 196 F.3d at 977. Also, it may be "material" that an administrator fails to follow its internal procedures for providing claimants with claim-filing documents, notice of denial, and/or review thereof. *See Friedrich,* 181 F.3d at 1110.

claims or appealing denials, or otherwise allowed a conflict of interest to taint its decision(s).

A mere allegation that the claims and review procedure in this case was somehow "unfair" does not satisfy the *Atwood* standard. In the case upon which Plaintiff primarily relies, *Friedrich*, the Ninth Circuit determined that the *record* supported findings that there had been insufficient notice of denial, an unfair review procedure, and inadequate dialogue regarding the beneficiary's claim. Furthermore, the court concluded that the *trial testimony* supported a finding that the "claims administrator ... administered Friedrich's claim as an adversary 'bent on denying her claim' and 'oblivious to her fiduciary obligations as administrator of the LTD Plan.'" *Friedrich*, 181 F.3d at 1110. Plaintiff has offered no similar *evidence* here. Rather, she relies on mere assertions which are not supported by the long record of review, re-review, and re-re-review by UNUM evident in this case.

■ For instance, Plaintiff first claims that a material conflict of interest is revealed by the fact that UNUM calculated Plaintiff's BMB ("basic monthly benefit") for the period of time during which it *paid* benefits (from July 21, 1995 to November 1, 1996) based on a thirty-two hour work week rather than a forty hour work week, when UNUM knew or should have known that Plaintiff changed to part-time status only slightly before filing her claim for total disability. Plaintiff's argument appears to be that she was *already* "disabled" pursuant to the policy terms when she switched to a thirty-two hour week, so that it was a breach of UNUM's fiduciary obligations not to calculate benefits based on a forty hour week. *See* Plaintiff's MSJ at 5–6. Despite the fact that it was *Plain-*

*tiff's counsel* who *insisted* that the BMB should be calculated for a thirty-two hour work week disputing the sixteen hour work week initially identified by Plaintiff's employer, that same counsel now argues that UNUM ought have, on its own, come to the conclusion that a thirty-two hour work week basis was improper.

This argument is nonsensical. First, the Court cannot find that UNUM's reliance on a thirty-two hour work week reveals its conflict of interest, when it was *Plaintiff* who insisted on this number of hours. Second, before filing this Complaint (in over four years of chances to do so) Plaintiff never argued to UNUM that a forty hour work week was a more appropriate basis. The Court can hardly hold UNUM accountable for not looking beyond Plaintiff's *own* claimed number of hours worked to determine whether Plaintiff was "wrong" about the basis for BMB. And third, even assuming that a forty hour work week *would* be a more appropriate basis for this calculation, there is no evidence that the "failure" to apply this basis resulted from a conflict of interest. At most, UNUM took Plaintiff at her word on her scheduled work week.

■ Plaintiff's second apparent basis for invoking a less deferential standard of review is UNUM's alleged "refusal" to consider the further evidence of her disability purportedly submitted by her attorney on October 23, 1998.[27] However, this is also not "material, probative evidence" tending to show the impact of a conflict of interest. Even assuming that these materials *were* submitted, and that UNUM "refused" to consider their contents, this is at most grounds for arguing that UNUM *abused* its discretion. This does not offer a basis for finding that UNUM should be *stripped* of discretion, as it does not show that

---

27. It is not entirely clear in Plaintiff's garbled papers whether this is offered as a basis for *departing* from an "abuse of discretion" standard, or is merely offered as alleged evidence of actual *abuse* of discretion by UNUM. The Court errs on the side of caution here.

UNUM acted in its own self-interest or breached a fiduciary duty.[28]

The Court's conclusion that Plaintiff has failed to offer any "material, probative evidence" of a conflict of interest, beyond the mere fact of its existence, renders unnecessary any proof by UNUM that this conflict had no effect on its decision-making *in this case*. The "first step" of the analysis has not been satisfied. Accordingly, the standard of review will remain abuse of discretion. The Court has considered the "inherent" conflict of interest in UNUM's "dual role," but finds no evidence that it breached its fiduciary obligation(s).

### B. The Court's Review Is Limited to the Administrative Record

■ When the abuse of discretion standard is applied, the review is generally limited to the administrative record. *See, e.g., Taft v. Equitable Life Assurance Society*, 9 F.3d 1469, 1471 (9th Cir.1993). This is because "[p]ermitting a district court to examine evidence outside the administrative record would open the door to the anomalous conclusion that a plan administrator abused its discretion by failing to consider evidence not before it." *Id.; see*

*also Mizzell v. Paul Revere Life Ins. Co.*, 118 F.Supp.2d 1016, 1020 (C.D.Cal.2000).[29] In other words, in assessing whether a particular decision constitutes an abuse of discretion, it only makes sense to limit review of that decision to the record upon which the decision was based. Normally, this is the administrative record lodged for purposes of appeal.

■ In this case, Plaintiff argues that the "administrative record," for purposes of this appeal, should be expanded to include the letter and attached documents allegedly sent to UNUM by Plaintiff's counsel on October 23, 1998. Plaintiff argues that because this evidence was "presented" to UNUM, it ought to be included in the "record" on which the Court reviews UNUM's denial.[30] *See* Motion to Expand at 4–9. In other words, Plaintiff claims this evidence was "before" UNUM in 1998.

This case presents an unusual circumstance. Generally, when the plaintiff seeks to augment the administrative record for purposes of an ERISA appeal, it is in the context of a *de novo* review, or for the limited purpose of demonstrating a conflict of interest.[31] Neither of those pur-

---

**28.** The same conclusion applies to what might be a third piece of "evidence" offered by Plaintiff in support of *de novo* review (again, it is often difficult to discern the purpose of Plaintiff's papers): the rejection of Dr. Berger's October 30, 1996 opinion as sufficient proof of ongoing disability beyond November 1, 1996. At most, UNUM's decision that this opinion did not support payment of benefits beyond November 1, 1996 was an *exercise* of its discretion under the policy, reviewed by this Court for an *abuse* thereof. Plaintiff again offers no reasonable basis for concluding that this fact ought to diminish the deference granted to UNUM by discretionary language in the policy.

**29.** This limitation to the administrative record may be contrasted with the limited admission of evidence to supplement an administrative record "only when ... additional evidence is necessary to conduct an adequate *de novo*

review of the benefit decision." *Mongeluzo v. Baxter Travenol Long Term Dis. Ben. Plan*, 46 F.3d 938, 944 (9th Cir.1995).

**30.** Plaintiff's counsel takes pains to argue that the record for review should be comprised of that evidence which was "presented" to the claims administrator, rather than just that which was "considered" thereby. *See* Motion to Expand at 5–7. However, counsel's papers fail to articulate the significance of this distinction, apply it to the facts of this case, or support it with relevant controlling authority.

**31.** *See Thomas v. Continental Casualty Co.*, 7 F.Supp.2d 1048, 1055 (C.D.Cal.1998) ("In most abuse of discretion cases, evidence outside the administrative record is completely inadmissible.... However, the rule in de novo cases is not so absolute."); *Tremain*, 196 F.3d at 977 ("[E]vidence outside the adminis-

poses applies here. In this case, instead, Plaintiff seeks to include documents allegedly *sent* to the administrator, but which never formed the basis for any decision on Plaintiff's claim.

For purposes of summary judgment, this Court cannot decide the disputed question of whether UNUM did in fact receive the documents allegedly submitted by Plaintiff on October 23, 1998.[32] However, this decision is not necessary to the Court's resolution of this issue.

This is because the records allegedly submitted by Plaintiff in October, 1998 were no part of the grounds for any "decision" by UNUM which Plaintiff has asked this Court to review. The Complaint, as is appropriate, is addressed to UNUM's August 5, 1998 "final" decision not to extend benefits beyond November 1, 1996. *See* Complaint ¶ 10 ("Defendant made a final administrative decision denying the claim on or about August 5, 1998, and has not afforded plaintiff with further review opportunity or appeal."). It is primarily this decision which must be measured against the administrative record. Therefore, the relevant record is that on which this "final" decision was made.

Even assuming that Plaintiff's counsel sent, and UNUM received, the documents in Exhibit 2 to the Motion to Expand, records "received" in October, 1998 could not possibly have been considered in the August 5, 1998 decision by UNUM to deny benefits beyond November 1, 1996. In the parlance adopted by Plaintiff's counsel, therefore, these records were neither "presented" to, nor "considered" by, the administrator, for purposes of the decision now on review. *See, e.g., Bendixen,* 185 F.3d at 944 ("Because the report was not before the plan administrator *at the time of the denial,* the district court was limited to that record and could not consider the report in its review.").[33]

Because this Court is primarily concerned with the propriety of the August 5, 1998 affirmance of the decision to grant benefits only through November 1, 1996, documentation "received" only *after* that decision was rendered is not properly part of the "record" against which it must be judged.[34] Accordingly, there is no basis to expand the official administrative record. For all of the foregoing reasons, Plaintiff's Motion to Expand the record is hereby DENIED.

---

trative record ... may be considered to determine if a plan administrator's decision was affected by its conflict of interest.");

**32.** Indeed, in deciding Defendant's MSJ, below, the Court assumes that UNUM *did* in fact receive these 1998 documents. *See* Part IV.C.

**33.** The "report" in question in *Bendixen* was a physician's report, presumably attesting to the plaintiff's long-term disability, which "was given to Standard after its second review had been completed and a final determination had been made." *Id.* Similarly, in this case, even if the Court assumes that Plaintiff's counsel *did* submit the 1998 medical records on October 23, 1998, he did so only *after* UNUM engaged in several reviews of Plaintiff's file, and rendered a final decision.

**34.** The Court treats the question of whether these documents must be made part of the "administrative record" on review separately from the question of whether these documents have any relevance to overall review of UNUM's exercise of discretion in this case. Therefore, the Court concludes that these documents are not part of a formal "record" of that evidence underpinning UNUM's administrative denial (in 1998). However, for purposes of the summary judgment Motions, the Court does assume that the records were sent and received, so as to assess UNUM's behavior *following* the "final" denial of benefits on August 5, 1998.

### C. UNUM Did Not Abuse Its Discretion in Terminating Benefits

On the record thus delimited, the Court reviews UNUM's decisions for an abuse of the discretion granted by the DCH policy. In its own Motion for Summary Judgment, Plaintiff contends that UNUM abused its discretion: by "underpaying" Plaintiff's benefits for the period of coverage from July 21, 1995 to November 1, 1996; and by improperly denying Plaintiff benefits beyond November 1, 1996. In Opposition, and its own Motion, Defendant argues: that any allegedly "underpaid benefits" cannot constitute abuse of discretion, since this argument was never *presented* to UNUM during its administrative process, and in any case Plaintiff's benefits were calculated properly per the policy; and that UNUM also did not abuse its discretion in its termination of Plaintiff's benefits as of November 1, 1996. The Court now considers the parties' cross-motions for summary judgment; for Defendant's MSJ, the Court assumes and construes all of the facts in Plaintiff's favor.

#### 1. The Abuse of Discretion Standard in an ERISA Review

Under the abuse of discretion standard, a decision by an ERISA administrator "will not be disturbed if reasonable." *Firestone*, 489 U.S. at 111, 109 S.Ct. 948.; *see also Zavora v. Paul Revere Life Ins. Co.*, 145 F.3d 1118, 1123 (9th Cir.1998) ("an ERISA administrator is entitled to substantial deference ... [so long as it has] some reasonable basis for its decision denying benefits."). Nearly any reasonable basis will do. For example, "even decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion." *Taft*, 9 F.3d at 1473; *see Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 63 F.Supp.2d 1145, 1158 (C.D.Cal.1999) (noting Ninth Circuit equates abuse of discretion with arbitrary and capricious).

It is an abuse of discretion for ERISA plan administrators "to render decisions without any explanation, or to construe provisions of the plan in a way that conflicts with the plain language of the plan." *Bendixen*, 185 F.3d at 944. Moreover, "an administrator ... abuses its discretion if it relies on clearly erroneous findings of fact in making benefit determinations." *Taft*, 9 F.3d at 1473. The Court may not, however, "substitute its judgment for that of the administrator ..." *Voight v. Metropolitan Life Ins. Co.*, 28 F.Supp.2d 569, 576 (C.D.Cal.1998). Finally, there need only be "substantial evidence" to support an administrator's decision. *See Snow*, 87 F.3d at 332.

#### 2. Legal Standard on a Motion for Summary Judgment

The party moving for summary judgment has the initial burden of establishing that there is "no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ. Pro. 56(c); *see British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978); *Fremont Indemnity Co. v. California Nat'l Physician's Insurance Co.*, 954 F.Supp. 1399, 1402 (C.D.Cal.1997).

If the moving party has the burden of proof at trial (*e.g.*, a plaintiff on a claim for relief, or a defendant on an affirmative defense), the moving party must make a "showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986) (quoting from Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984)). Thus, if the moving party has the burden of proof at trial, that party "must establish beyond peradventure *all* of the essential elements of the claim or defense to war-

rant judgment in [its] favor." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original); *see Calderone,* 799 F.2d at 259.

If the opponent has the burden of proof at trial, the moving party has no burden to negate the opponent's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (citations omitted).

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.Pro. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant. *Id.* at 248, 106 S.Ct. 2505. However, the court must view the evidence presented "through the prism of the substantive evidentiary burden." *Id.* at 252, 106 S.Ct. 2505.

### 3. The Alleged "Underpayment" of Benefits

Plaintiff argues that UNUM impermissibly erred in calculating Plaintiff's payable benefits from July 21, 1995 to November 1, 1996 based on a thirty-two rather than a forty hour work week. Plaintiff claims that at the time of her (short-lived) transfer to a part-time position, she was *already* "disabled" under the 20% loss in earnings prong of the policy definition, and that UNUM should have known that it was improper to base BMB on an *already-reduced* part-time salary. Following a convoluted series of calculations and offsets, Plaintiff seeks an additional sum of $3,642.46 which she claims she is owed.

Plaintiff does not and cannot argue that any of her claim forms asserted an entitlement to benefits based on a forty hour week. Nor does she dispute that it was in fact *her present counsel* who insisted (as far back as December 17, 1997) that Plaintiff's benefits should be calculated based on a thirty-two hour week. It was also Plaintiff's own claim form which listed her last day of work as April 21, 1995.[35] Plaintiff never claimed that her "disability" actually started when she was transferred to the Home Health department on April 3, 1995. Indeed, Plaintiff originally claimed only a *sixteen* hour week. In the nearly five years of administrative review of her claim for benefits, Plaintiff never once asserted that thirty-two hours was an improper basis for benefits, or that she was entitled to a larger benefit.

Accordingly, as Defendant points out, it is simply impossible to find that UNUM "abused its discretion" in not considering

**35.** Notwithstanding Plaintiff's reference therein to July 3, 1993.

evidence or argument which was never *presented* to the administrator. UNUM was never given the *opportunity* to "abuse its discretion" on this issue.

 This means that in any case there is absolutely no basis for the Court to simply *award* Plaintiff the additional "underpaid" benefits. It would be reversible error for this Court to grant relief based on evidence which was never presented to the administrator, or at least was obscured by Plaintiff's own argument on entitlement to benefits. Determinations of entitlement to benefits, and amounts thereof, are supposed to be made in the first instance by the plan administrator, not by a court sitting in review thereof.[36] This is most consistent with the administrative exhaustion requirement read into ERISA.[37]

 Therefore, the most that Plaintiff might seek would be a remand to the administrator for consideration of the argument(s) newly raised in this appeal. However, the Court also declines to order a remand, for at least two very compelling reasons. First, where Plaintiff has delayed nearly five years in articulating an entitlement to benefits in excess of those beyond those which she initially claimed, she may not now be heard to complain that *UNUM* ought to have disregarded her own claim forms and her counsel's arguments, and extended her greater benefits than those to which her own claim entitled her. The passage of time is reason enough not to force UNUM to revisit this issue.

Second, and more importantly, the Court finds that the level of benefits paid by UNUM from July 21, 1995 was both a reasonable and a defensible interpretation of Plaintiff's own claim documents and the policy terms. As Defendant points out, the policy provides that an insured's "Basic Monthly Earnings" should be determined by reference to "the insured's monthly rate of earnings *just prior to the date disability begins.*" AR 261 (emphasis added). Plaintiff's own claim form listed her last day of work at DCH as April 21, 1995, and it was Plaintiff's counsel who insisted that she was working thirty-two hours a week in the period "just prior" to this date. Notwithstanding the basis for benefits newly argued by Plaintiff on appeal, UNUM did not abuse its discretion in basing benefits on a thirty-two hour week.[38]

Therefore, the Court DENIES Plaintiff's MSJ on this ground, and finds that Defendant is entitled to judgment as a matter of law on Plaintiff's claim that she was deprived of adequate benefits for the July 21, 1995 – November 1, 1996 period. The Court GRANTS Defendant's MSJ to

---

**36.** This restraint is consistent with the general goal of ERISA of balancing review with administrative efficiency: "A primary goal of ERISA was to provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously. Permitting or requiring district courts to consider evidence from both parties that was not presented to the plan administrator would seriously impair the achievement of that goal." *Taft,* 9 F.3d at 1472 (citations omitted).

**37.** *See Diaz v. United Agricultural Employee Welfare Benefit Plan and Trust,* 50 F.3d 1478, 1483 (9th Cir.1995) ("Quite early in ERISA's history, we announced as the general rule governing ERISA claims that a claimant must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court.").

**38.** While Plaintiff's theory may *also* be a potentially reasonable interpretation of the policy terms, it is not for this Court to choose among competing interpretations. UNUM's basis for its calculation of benefits is a defensible reading of the policy; this ends the inquiry. UNUM reserved the discretion to make just this sort of interpretation.

the extent that it seeks dismissal of this basis for relief.

### 4. Termination of Benefits As Of November 1, 1996

Plaintiff's primary argument, of course, is that UNUM abused its discretion on August 5, 1998 (and thereafter) in determining that she was not entitled to benefits beyond November 1, 1996. Plaintiff seeks reinstatement of benefits retroactive to that date, and a declaration of entitlement to future benefits subject to the terms of the policy.

To the extent it can be determined, from Plaintiff's counsel's somewhat disjointed papers, it appears that Plaintiff's challenge to UNUM's decision to terminate her benefits as of November 1, 1996 is composed of essentially three components. First, counsel argues that Plaintiff was not afforded the "full and fair review" of her claim guaranteed by ERISA. Second, counsel contends that UNUM's June and August, 1998 decision(s) to terminate Plaintiff's benefits were not supported by "substantial evidence," and were an abuse of discretion. And third, counsel claims that the Court must look not only to these 1998 decisions, but also to UNUM's subsequent conduct in rejecting or failing to consider the October 23, 1998 submission, which allegedly gave further support to Plaintiff's ongoing disability claim. *See* Plaintiff's MSJ at 6–7, 12–17, 10–11; DMSJ Opposition at 5–14.

Defendant responds that the Ninth Circuit test for an abuse of discretion requires only that a plan administrator not make a decision without providing any explanation, or a decision that conflicts with the plain language of the plan, or a decision that is based on clearly erroneous findings of fact. *See* PMSJ Opposition at 12; Defendant's MSJ at 18 (citing *Snow*, 87 F.3d at 331). Defendant contends that not only is it clear that none of these conditions is met,

but due to the almost total lack of evidence of either ongoing disability or care of a physician beyond November 1, 1996, UNUM did not abuse its discretion in terminating Plaintiff's benefits beyond that date. *See id.*

This case does not present the issue that is usually preeminent in an ERISA disability benefits case: a choice among several competing physicians' opinions as to the disability status of the individual. Instead, this case is determined by the very *lack* of medical records. On the evidence presented, UNUM simply did not abuse its discretion.

#### a. A "Full and Fair" Review

 Plaintiff first argues that UNUM failed to provide a "full and fair review" of its denial of her claim for benefits. She cites to Section 503 of ERISA (29 U.S.C. § 1133), which requires that a plan:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, *setting forth the specific reasons for such denial,* written in a manner calculated to be understood ..., and (2) afford a *reasonable opportunity* to any participant whose claim for benefits has been denied for a *full and fair review* ... of the decision denying the claim.

29 U.S.C. § 1133 (emphasis added). Specifically, Plaintiff cites the regulation(s) written to implement the criteria for an administrative review of a denial of benefits, 29 C.F.R. § 2560.503–1 (1996).

The "Scope and purpose" subsection of this regulation spells out that Section 503 "sets out certain minimum requirements for employee benefit plan procedures pertaining to claims ... for plan benefits, consideration of such claims, and review of claim denials ..." 29 C.F.R. § 2560.503–

1(a) (1998).[39] Remaining subsections give details:

(e) Notification to claimant of decision. (1) If a claim is wholly or partially denied, notice of the decision, meeting the requirements of paragraph (f) of this section, shall be furnished to the claimant within a reasonable period of time after receipt of the claim by the plan. (2) If notice of the denial of a claim is not furnished ... within a reasonable period of time, the claim shall be deemed denied and the claimant shall be permitted to proceed to the review stage described in paragraph (g) of this section. (3) For purposes of paragraphs (e)(1) and (e)(2), of this section, a period of time will be deemed to be unreasonable if it exceeds 90 days after receipt of the claim by the plan ...

(f) Content of notice. A plan administrator ... shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:

(1) The specific reason or reasons for the denial; (2) Specific reference to pertinent plan provisions on which the denial is based; (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

(g) Review procedure. (1) Every plan shall establish and maintain a procedure by which a claimant or [his/her] duly authorized representative has a reasonable opportunity to appeal a denied claim to an appropriate named beneficiary or to a person designated by such fiduciary, and under which a full and fair review of the claim and its denial may be obtained. Every such procedure shall include but not be limited to provisions that a claimant ... may: (i) Request a review upon written application to the plan; (ii) Review pertinent documents; and (iii) Submit issues and comments in writing ... (3) A plan may establish a limited period within which a claimant must file any request for review of a denied claim ... In no event may such a period expire less than 60 days after receipt by the claimant of written notification of denial of a claim.

(h) Decision on review. (1)(i) A decision by an appropriate named fiduciary shall be made promptly, and shall not ordinarily be made later than 60 days after the plan's receipt of a request for review ... (4) The decision on review shall be furnished to the claimant within the appropriate time described in paragraph (h)(1) of this section. If the decision on review is not furnished within such time, the claim shall be deemed denied on review.

29 C.F.R. §§ 2560.503–1(e), (f), (g), and (h) (1998).

As one court in this district notes, there are few cases directly addressing the legitimacy of ERISA appellate processes. *See Mizzell*, 118 F.Supp.2d at 1023. However, the Ninth Circuit recently stated:

In simple English, what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis

---

**39.** This regulation was later amended, on November 21, 2000, but the language as cited is that applicable in 1998, the same language applicable from 1984 until 2000 (previous amendment April 30, 1984).

for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this . . . [provision].

*Booton v. Lockheed Medical Benefit Plan,* 110 F.3d 1461, 1463 (9th Cir.1997); *see also id.* at 1465 (restating this "simple" proposition).

Plaintiff fails to identify what about the review procedures in this case were not "full and fair," or how any alleged departure from the procedural requirements established by this regulation led to any *substantive* prejudice to her claim for benefits. *See, e.g., Parker v. BankAmerica Corp.,* 50 F.3d 757, 768–69 (9th Cir.1995) (a procedural violation of ERISA does not warrant an award of benefits unless it caused a substantive violation or itself worked a substantive harm). Plaintiff seems to focus on UNUM's non-response to counsel's alleged submission of additional documentation in October, 1998. *See, e.g.,* Plaintiff's MSJ at 6; DMSJ Opposition at 5. However, counsel cannot articulate any basis for concluding, *even if* the Court assumes that UNUM received these documents, made some decision thereon, and never told Plaintiff that it was nonetheless denying her claim, that this was a procedural violation. Rather, as Plaintiff herself points out, under 29 C.F.R. § 2560.503–1(h)(4), the non-publication of any such denial on review would merely mean the appeal is "deemed" denied.

There is nothing to suggest that UNUM failed to provide a "full and fair review" of Plaintiff's claim (or its initial denial thereof). Quite to the contrary, UNUM repeatedly provided Plaintiff with timely and adequate notice, in the form of letters from claims agents which clearly laid out the pertinent language of the policy, identified the reason(s) for denial of benefits, and informed Plaintiff that in order to receive benefits she would have to provide evidence that she was both disabled (from her occupation) and under a physician's care on an ongoing basis. Indeed, from the initial denial on January 18, 1996, UNUM engaged in over two and one-half years of "review" of Plaintiff's claim, and ultimately *reversed in part* its initial denial of benefits, in June and August of 1998. This review was at least "full and fair."

**b. The Decision(s) to Terminate Benefits**

■ Plaintiff also argues that the June and August, 1998 decision(s) not to extend payment of disability benefits beyond November 1, 1996 were an abuse of discretion, not supported by "substantial evidence." However, this Court cannot agree with Plaintiff's characterization.

■ Under abuse of discretion review, the Court must uphold a plan administrator's decision to deny benefits unless it was "arbitrary and capricious," "clearly erroneous," was offered without any explanation, or was contrary to the plain language of the policy document. There need only be a "reasonable basis" for an administrator's decision, and a decision is sustainable even where directly contrary to evidence in the record. Under this standard, UNUM's decision(s) must be affirmed. Far from being arbitrary and capricious, UNUM's actions throughout the pendency of Plaintiff's claim (1995 through 1998) were solicitous of Plaintiff's interests, extended her every opportunity to augment her claim, and even granted benefits in the absence of full documentation.

At the time that UNUM made its final decision on August 5, 1998, Plaintiff had still never provided UNUM with records establishing her ongoing disability or regular treatment by a physician beyond November 1, 1996. Indeed, UNUM was somewhat generous in accepting Dr. Charles' November 1, 1995 assertion that

Plaintiff would remain disabled "for a year" in the apparent absence of underlying medical records showing an objective basis for that assertion. Despite repeated requests for any records of treatment post-dating Dr. Charles' November 1, 1995 opinion letter, prior to August 5, 1998 UNUM never received anything other than Dr. Berger's October 30, 1996 claim form, and Dr. Rabinovich's March 14, 1996 report on Plaintiff's spinal difficulties. There was a virtual absence of "proof" of ongoing disability or treatment.

Plaintiff insists that the Long Form Medical Report completed by Dr. Berger on October 30, 1996 should have been enough, on its own, to substantiate Plaintiff's claim for benefits, and that UNUM's alleged "disregard" thereof was an abuse of discretion. *See* Plaintiff's MSJ at 12–15. Plaintiff argues there was no "substantial evidence" in the record upon which UNUM could rely to "reject" Dr. Berger's opinion, and it was therefore required to "accept" it and pay benefits thereon.

■ However, Plaintiff misconstrues the basis for UNUM's August 5, 1998 denial. This was not a "rejection" of Dr. Berger's opinion, *per se*, but rather a recognition that Plaintiff had not yet satisfied her obligation to provide sufficient proof of ongoing disability. Though ERISA is infused with principles of trust and fiduciary obligations, it is still at heart a determination of contractual obligations, and conformance therewith. *See, e.g., Cisneros v. UNUM Life Ins. Co. of America,* 134 F.3d 939, 943–44 (9th Cir.1998) (noting that contractual proof-of-claim requirements would determine timeliness of proof, but for the applicability of the California "notice-prejudice" rule). As Defendant points out, "Dr. Berger's report only emphasized the great gap in medical evidence, documents that UNUM requested *once again* from Alford and her attorney." PMSJ Opposition at 14. Plaintiff's proof of ongoing disability and treatment was a condition precedent to her receipt of benefits, under the policy language.[40] In the absence of sufficient proof, UNUM incurred no obligation to pay these benefits.

Though Plaintiff had provided *some* proof of disability, there was very little to suggest that it would stretch beyond November 1, 1996. *All* of the actual medical *records* to that point submitted to UNUM were from treatment performed prior to the end of *1995*. To substantiate disability (and treatment) in 1996 and beyond, Plaintiff had submitted only Dr. Charles' November 1, 1995 opinion, Dr. Rabinovich's March 14, 1996 opinion, and Dr. Berger's October 30, 1996 opinion.[41] UNUM was somewhat generous to accept Dr. Charles' opinion that Plaintiff would be disabled for the following year; it was under no *obligation* to make a similar assumption on the basis of Dr. Berger's opinion.[42] This is particularly true because Dr. Berger him-

---

**40.** This requirement is explicit. *See* AR 274 ("*When* the Company receives proof that an insured is disabled ... and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit ... The benefit will be paid for the period of disability *if* the insured gives to the Company proof of continued: 1. disability; and 2. regular attendance of a physician. The proof *must be given upon request and at the insured's expense.*") (emphasis added).

**41.** As Plaintiff concedes, the ALJ's determination on December 3, 1996 that she was enti-

tled to Social Security disability benefits was not binding on UNUM. *See Madden v. ITT Long Term Disability Plan for Salaried Employees,* 914 F.2d 1279, 1286 (9th Cir.1990). This decision also relied primarily on medical records up through 1995. It is thus nearly irrelevant to UNUM's determination as to Plaintiff's status.

**42.** Notwithstanding Plaintiff's counsel's belief that the October 30, 1996 report should allow UNUM "to extend benefits for a reasonable period of time beyond October 30, 1996." AR 299 (July 2, 1998 letter).

self *offered* no opinion as to the potential duration of Plaintiff's ongoing disability. He simply stated that, based on her *partial complex seizures,* she was at that point unable to return to work in her regular occupation.[43] In the absence of medical records supporting Dr. Berger's opinion, and with the lack of specifics (e.g., restrictions and limitations, or duration of inability to work *past* October 30, 1996) therein, UNUM was within its rights in requiring further documentation of ongoing disability.

Far from being arbitrary and capricious, UNUM's August 5, 1998 decision to grant benefits through November 1, 1996, but to terminate benefits on that date, was substantially supported by the record then before the administrator. Though Plaintiff was apparently continuing to see physicians during that period, and ostensibly might even have been able to substantiate her ongoing disability, she failed to meet the contractual condition precedent of submitting that proof to UNUM. UNUM acted within its discretion in choosing to terminate benefits.

### c. The Alleged Additional Evidence

■ Even assuming, as the Court must for summary judgment purposes, that Plaintiff's interpretation of notations in the administrative record is correct, and that Plaintiff's counsel did submit, and UNUM received, additional records following the August 5, 1998 decision, this does not alter the Court's conclusion that UNUM did not abuse its discretion in this case. First of all, even Plaintiff admits that the additional treatment records were allegedly submitted after the sixty day deadline established by Gilfillan's August 5, 1998 letter already had lapsed. Though UNUM had

thus far been gracious about repeatedly accepting late submissions from Plaintiff, and engaging in numerous ongoing discussions about her claim, it was also entitled to have the processing of her claim at some point come to a final conclusion.

It was not unreasonable to ask Plaintiff to submit any further records underlying Dr. Berger's (or Dr. Charles') opinion within sixty days, particularly where UNUM had *repeatedly* requested records from the end of 1995 and beyond. Therefore, the records allegedly sent on October 23, 1998 (received on October 29, 1998) were untimely, as an initial matter, and UNUM might well have ignored them for that reason.

■ Moreover, even if UNUM (or this Court) were to *consider* those records allegedly submitted on October 23, 1998, it would still not have been an abuse of discretion to deny Plaintiff's entitlement to disability benefits as of November 1, 1996. This is because even the records submitted on October 23, 1998 only covered Plaintiff's visits to Dr. Berger *in 1998,* and only included Residual Functional Capacity Forms completed by Drs. Berger, Charles, and Chen *in 1998.* Plaintiff *still* provided no medical records from late 1995 to early 1998. This left a gap of nearly two years between physicians' opinions submitted, and *over* two years between actual medical *records* received. There was still no actual proof of any treatment beyond November 1, 1996.

Thus, even if the Court assumes that UNUM received the further submission on October 29, 1998, this submission would not require a conclusion that Plaintiff was disabled and entitled to benefits *as of November 1, 1996.* Indeed, the latest treat-

---

**43.** Moreover, Dr. Berger was Plaintiff's then-treating physician for her *diabetes,* but his opinion that she was disabled from work was based on the possibility of "partial complex seizures," for which he was *not* her treating physician. The same observation is true of Dr. Berger's recounts of neck and back problems experienced by Plaintiff.

ment records prior to 1998 that UNUM had been provided at that point were from sometime in 1995.

■ Plaintiff did not finally provide any treatment records relating to 1996 and 1997 until Plaintiff's counsel finally, eighteen months later on April 20, 2000, submitted over two hundred pages of further medical treatment history spanning 1993 to 2000. This submission of records, even were it sufficient to establish disability, was far too late to be within any "reasonable" appeal period to which Plaintiff was entitled. Almost two years beyond the "final" denial on August 5, 1998, Plaintiff's counsel finally provided records which UNUM had been requesting since early 1996. Why these records were never provided in response to UNUM's many earlier requests is unclear. What is clear is that UNUM was not required to consider records submitted more than four years after Plaintiff's written appeal of its initial denial.

The most difficult circumstance presented by this case is that it does appear that Plaintiff suffers from many serious conditions, any one of which might have been sufficient to render her "disabled" under the terms of the policy. The records finally submitted in 2000 do appear to suggest that Plaintiff continues to undergo a substantial range of treatments for her various ailments. However, where evidence of those conditions was not presented to UNUM in a timely fashion, as required by the terms of the insurance policy governing this action, the Court can hardly say that UNUM abused its discretion in finding insufficient basis to pay out ongoing benefits. This is not a case in which UNUM *rejected* evidence of disability presented by Plaintiff; it simply found that Plaintiff had failed to *present* sufficient proof. UNUM gave Plaintiff innumerable opportunities to supplement her file, and even paid benefits up through November

1, 1996 despite the lack of overwhelming proof of disability to that point (and perhaps contrary to the opinion of its own vocational consultant). It was entitled to close Plaintiff's claim at some point, and it did so only after over two and one half years of review and re-review of its denial.

Based on this record, the Court finds that Plaintiff has failed to establish the existence of any genuine issue of material fact that might tend to show an abuse of discretion on UNUM's part. Therefore, the Court finds that UNUM is entitled to judgment as a matter of law. The Court hereby DENIES the remaining bases for Plaintiff's MSJ, and hereby GRANTS Defendant's MSJ, in full. Even construing the evidence in the light most favorable to Plaintiff, as it must, the Court can find no basis to support a right to reinstatement. Accordingly, the Court hereby DISMISSES Plaintiff's Complaint, in full, with prejudice.

### V. CONCLUSION

For the foregoing reasons, the Court finds no basis to order the administrative record to be augmented with the documents contained in Exhibit 2 to Plaintiff's Motion to Expand. Accordingly, the Court hereby DENIES the Motion to Expand. Further, the Court concludes that on this record UNUM acted within its discretion both in calculating a level of benefits from July 21, 1995 to November 1, 1996 based on a thirty-two hour work week, and in finding that Plaintiff had not shown an entitlement to benefits beyond that period. Thus, the Court also DENIES Plaintiff's MSJ, and GRANTS Defendant's MSJ. The Court hereby DISMISSES Plaintiff's Complaint, in its entirety, with prejudice.